People of the State of Illinois, Plaintiff-Appellee, v. James P. Mitchell, Defendant-Appellant.

**Gen. No. 50,469.**

First District, First Division.
February 18, 1966.
Rehearing denied July 19, 1966.

Charles A. Brady, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant, James P. Mitchell, was convicted in a bench trial of murder and sentenced to twenty-five years in the penitentiary. His reasons for appeal are that (1) the state failed to prove him guilty beyond a reasonable doubt and (2) he was deprived of a fair trial because of (a) incompetency of counsel and (b) conduct and prejudicial errors on part of the trial court.

The evidence before the court was as follows: Fannie Mae Webber, common-law wife of Willie Edwards, the deceased, testified that she was with him at about 10 or 10:30 on the evening of August 6, 1960 in the Edwards restaurant. Willie left her and went to the Frader Juke

Box Lounge next door. After a certain length of time she joined him in the lounge. They then left and as they were walking toward their car which was parked across the street, defendant came up and told the deceased he wanted to talk to him. She entered the car and the two men went into the alley adjacent to the lounge. She said they then grabbed hold of each other and "were just tussling" when some fellow came from across the street to try to separate them. She left the car and ran into the restaurant to get deceased's brother, Jesse, who came out and went to where the men were "tussling." In her excitement she reentered the restaurant and when she came out the second time "they were still tied up." Jesse and one Chuck Willet were separating them. Again, she entered and came out of the restaurant and then saw Willie's car backing out of the alley with Jesse driving and Willie in the passenger seat. "A couple minutes later someone yelled Look out, look out, he has a gun." She was on her way to the car when she saw defendant running out of the alley toward it. Police officers were on the scene. The car was stopped in the street, having been "blocked" by a police car. Defendant was standing at the passenger side of the car, firing into it. She heard about four or five shots. The officer then took hold of the defendant. Later defendant and the deceased were transported to a hospital. On cross-examination she said she did not see a knife; that Jesse had nothing in his hands when he came out of the restaurant, and that she did notice blood on defendant's back.

Jesse Edwards testified he was employed as a cook for his brother, Cleve Edwards, at the Edwards restaurant. He saw his brother Willie, the deceased, and Fannie come into the restaurant, and saw Willie leave and Fannie follow shortly thereafter. Later Fannie came for him and he ran out into the alley where he saw Willie and the defendant tussling with each other. He tried to break

them up. Finally, he got them apart and told Willie he would take him home. He "put Willie on the passenger side of the car." Chuck took the defendant up the alley about 50 feet away from the car. Jesse got into the driver's seat, backed the car out into the street and as he started to proceed down the street he saw the defendant, with something in his hand, running from the alley some 60 feet away. Willie, seeing Mitchell with whatever he had in his hand, "laid over in the car." Jesse proceeded slowly down the street when he heard someone holler "Halt." He saw defendant running along the passenger's side of the car and heard about three or four shots. He stopped the car and a police officer came up. On cross-examination Jesse said that when he left the restaurant he had nothing in his hand; he did not notice any weapon in the possession of either of the men quarreling; he did not notice any blood on either of the men and that it was about a minute between the time the fight broke up and defendant appeared with the gun. "At the time when we separated James Mitchell and my brother, Willie, I took Willie to the car and Chuck Willet took James Mitchell up the alley in front of the car and he went behind [to the rear of] the building and just as I started up the car, backed out into the street and when I started pulling away, that is when I saw Mitchell come back running out of the alley."

Jesse Macklin, a bystander, saw defendant and deceased fighting and the "break up." He said he saw Willie and his brother Jesse get into the car and the defendant "disappear" down the alley. Jesse backed out of the alley and "headed" into the street. Mitchell came running out of the alley up to the car and started to point and shoot into the car. He fired three, maybe four, shots. When cross-examined, he said he saw Jesse come out of the restaurant and he had nothing in his hands. He saw blood on Mitchell's back. He noticed no weapon in possession of either men fighting.

Police officer Grimes and his partner, Pamon, were cruising in a squad car. After a conversation with an unidentified man, they proceeded to the scene, a half block east. As Grimes was preparing to make a left turn into the alley from the middle of the street, an automobile was backing out and proceeded west down the street. He saw defendant ten or twelve feet in the alley, running out into the street with a gun in his hand. Grimes and his partner got out of the police car and he hollered "Halt." Defendant ran to the car which had stopped and fired five shots. The officers disarmed and placed defendant in custody. Grimes went to the passenger side of deceased's car, opened the door and observed a knife with the blade closed lying on the front seat, near the deceased. Mitchell, the defendant, had blood stains on his shirt. The knife had fresh blood on it.

Officer Rodgers, assigned to the investigation, saw defendant at the hospital and observed two wounds in his back.

Frader Culp, owner of the lounge said she was behind the bar waiting on customers when she heard shots fired. She went to the scene and saw the defendant's back covered with blood. She saw a closed knife after the police picked it up.

Defendant testified that he was a disc jockey in the advertising and public relations business. He was at the lounge on the evening in question to take recordings of the band by means of his sound truck parked in front. He had a conversation with the deceased in the lounge concerning the fact that defendant was interested in having food served in the lounge. The deceased was "put out about it." In the conversation the deceased said "You won't be able to operate a restaurant over here because we have a restaurant next door." Defendant went about his work, going to the truck and returning to the lounge. He later went outside, saw the deceased parking his car in the alley, and heard him say "Mitchell,

I would like to speak to you." They walked to the front of the car and deceased began verbally abusing him. The deceased swung at him, missed and fell. Defendant stepped back. Deceased started to lunge when defendant grabbed him "in the collar" and tried to dissuade him from any violence. Jesse came and defendant continued to plead that there be no violence. The deceased reached into his pocket and started to open a knife. Defendant started back four steps when he felt a "lick" in his back. He turned, swung deceased around and tripped him with his right foot causing both to fall to the ground. Deceased "hit" him in the back with the knife and defendant held him there. Jesse was coming to him with a cleaver. He became frightened and went to one knee, got out of the way, and started to run onto the sidewalk. The deceased made two more steps and hit him in the back. He stumbled from the "lick" and found himself near the sound truck. That is when he reached in and took the gun. He yelled to a girl to call the police. He heard footsteps and saw deceased and his brother, Jesse, and told them to wait for the police. "All this time I was shielded by the truck, so I went into the alley, followed them up into the alley and, just as Jesse said,* he got into the driver's side, [and] Willie got on the other side." He followed, imploring them to wait for the police. Both Jesse and the deceased told him to get away from the car, that they weren't going to wait for the police. Jesse pushed the door open and defendant fell back. He got up, saw the car start, the light go on, the car move in his direction, the direction he was running, and then back up. As he noticed the car was headed west in the street, he ran to the car saying "Hold it, you are supposed to wait for the police." Deceased "at that time reached forward and took the same knife and he started to turn to the door and I shot one time up slightly, purposely to let him know

---

* Referring to Jesse's testimony.

40

that I had a gun, otherwise he would open the knife, but he still started to come forward, then I shot in the car, trying to shoot him in the hand, trying to shoot the knife as part of his hand, but the car being moving the bullet struck him in some other part that I later found out. And he had the knife in his hand at the very same time that I fired the shot and he was coming toward me and he kept moving and I fired the second shot. The third shot was fired after I noticed the knife was still in his hand and he kept coming toward me, but the first time, Your Honor, I had fired the gun away from the car."

The fact of homicide was not disputed. Defendant argues that it was justified because of self-defense or mitigated because of provocation. The Criminal Code applicable at the time (Ill Rev Stats 1959, c 38 § 367) provided:

> If a person kill another in self-defense, it must appear that *the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also,* that the person killed was the assailant, or *that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.* [Emphasis added.]

■ ■ The evidence discloses that the deceased had abandoned the fight and the defendant was in pursuit at the time he fired the mortal shots. It was not a killing in self-defense. Defendant, in the alternative, contends that the homicide was manslaughter rather than murder. The statutes then in effect (Ill Rev Stats 1959, c 38 par 361) defined the offense as follows:

> Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be

41

voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, or involuntary in the commission of an unlawful act, or a lawful act without due caution or circumspection.

Applying these principles to the facts here, defendant's contention must be limited to voluntary manslaughter (Ill Rev Stats 1959, c 38 par 362) :

In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. *The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the killing sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.* [Emphasis ours.]

It was for the trial court to determine whether, from the evidence, there was an interval between the assault and the killing sufficient for the voice of reason and humanity to be heard. The court found there was and from the record we cannot say it was so unreasonable as to warrant a reversal.

■ ■ Defendant next contends that "[t]he neglect with which counsel for James Mitchell conducted his defense deprived the defendant of a fair trial." He admits that where defendant has counsel of his own choice, the lack of skill or care exercised in the trial rarely affords a basis for reversal of a judgment of conviction. In People v. Williams, 26 Ill2d 190, 194, 186 NE2d 353 (1962), the court said that it had repeatedly held that the incompe-

42

tency of counsel of one's own selection cannot give rise to a claim of a denial of due process unless the representation was of such caliber as to reduce the proceedings to a farce and a sham. See also People v. Cox, 12 Ill2d 265, 146 NE2d 19 (1957); People v. Clark, 7 Ill2d 163, 130 NE2d 195 (1955); People v. Morris, 3 Ill2d 437, 121 NE2d 810 (1954). But defendant argues that after the judge "refused to allow him to hire different counsel" his attorney was no longer counsel of his choice, and that therefore this principle does not apply. We do not agree. The record discloses that after commencement of the trial and some testimony was heard, he requested substitution of counsel. Neither of the attorneys he suggested as a substitute was present or available, and his originally chosen counsel carried on with the active participation of the defendant whom the trial court commended for his capable assistance. Defendant's complaint of his counsel's incompetency in failing to call certain witnesses is unconvincing. Calling of witnesses is a matter of trial tactics upon which skilled lawyers will differ. People v. Palmer, 31 Ill2d 58, 65, 198 NE2d 839 (1964). Upon reading the record we further find that the testimony of these witnesses would be cumulative. It could add no more than what the proof and defendant's version had established. He was not deprived of a fair trial because of incompetency of counsel.

■ Defendant claims the trial court committed reversible error when it precluded him from impeaching the witness Fannie Webber. The latter was recalled as defendant's witness. On direct examination he began asking questions from a transcript of her testimony given at the coroner's inquest. The court sustained the state's objection to this line of interrogation. Although an offer of proof was made available, the questions and attempted impeachment are not contained in the record for our examination. Nevertheless, we feel that the matter was inconsequential and could not prejudice defendant so as

43

to deny him a fair trial. Fannie Webber, as witness for the state, gave testimony regarding the preliminary tussle, position of the car involved, and the "couple of minutes later" when she heard someone cry out a warning that defendant was approaching with a gun. With the proof adduced, including defendant's testimony, we do not believe any deviation from her original testimony would justify our disturbing the finding of the trial judge, who was the trier of the facts.

██ Defendant, finally, complains that the trial court committed multiple improprieties, thereby depriving him of a fair trial. We have searched the record and find such charge without substance. The discussions with counsel about the length of the trial, engagement of counsel with other court calls, the regulation of the trial hours, the chamber conferences, and the refusal of the judge to hear from the defendant in chambers were properly part of the usual conduct in a criminal trial. The defendant's rights were not prejudiced.

For these reasons, the defendant's conviction of murder is affirmed.

██ It is our further belief that the defendant's sentence to the Illinois State Penitentiary for twenty five years was excessive viewed in the light of all the conditions and circumstances of the occurrence. Under the authority of Ill Rev Stats (1963), c 38, par 121–9(b)(4), we have the power to reduce the sentence. A proper and just sentence, in our opinion, would be for a period of fourteen years. Defendant is hereby sentenced to the Illinois State Penitentiary for a term of fourteen years in lieu of twenty five, to be computed and served according to law.

Judgment affirmed and modified.

MURPHY and BURMAN, JJ., concur.