THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JEFFREY L. WHITE, Defendant-Appellant.

Fourth District    No. 4—03—0246

Opinion filed December 3, 2004.

Daniel D. Yuhas and Susan M. Wilham, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

On January 24, 2003, a jury convicted the defendant, Jeffrey L. White, of three counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 2000)) for the killing of Travis Williams. On March 11, 2003, the trial court sentenced him to 28 years in prison. On appeal, the defendant argues that (1) the court erred by failing to appoint a special bailiff under section 13 of the Jury Act (705 ILCS 305/13 (West 2002)), (2) the court should have instructed the jury on the justifiable use of force in self-defense and the second degree mitigating factor of sudden and intense passion by provocation, and (3) he was not proved guilty beyond a reasonable doubt. We affirm.

Leslie Creason testified that on July 31, 2002, she and Andrew Murphy arrived at the Macon County courthouse in Decatur at approximately 8:20 a.m. Each had a traffic matter to resolve. After Leslie finished her case, she sat in the back of the courtroom and noticed the defendant enter the courtroom. The defendant walked up to a man located on the other side of the courtroom, tapped him on the shoulder, made eye contact with Andrew, and left. Andrew and Leslie later left the courthouse and proceeded to Leslie's car. She began to pull out when Andrew turned around and stated that the defendant was behind them. Leslie looked in her rearview mirror and saw a brown or tan Honda with tinted windows "chasing" her. She eventually "lost" the vehicle by taking a complicated route.

Leslie then drove across town to 541 West Waggoner, the home of Travis Williams and Lisa Creason, her sister. She hurried and started walking up to the house; Andrew was behind her. Leslie saw the car that had been following them reappear and drive toward them. She went inside and told Travis that Andrew wanted to talk to him. Travis walked outside to the porch, and Leslie immediately heard a series of four gunshots.

Dr. Travis Hindman, a forensic pathologist, testified that the cause of Travis's death was brain trauma due to a gunshot wound to the head.

The defendant testified that Corlis McSpadden had given him, Derek Edwards, and Bobby Talley money to travel from Decatur to Arizona on July 14, 2002, and purchase 50 pounds of cannabis for him. On July 17, 2002, while driving back to Decatur, the defendant and Edwards decided to instead steal the entire amount of the substance purchased for McSpadden. The pair abandoned Talley in New Mexico. On July 18, 2002, the defendant and Edwards arrived back in Decatur, where McSpadden confronted them at gunpoint, struck the defendant in the face with his weapon, and ran over Edwards with his vehicle. McSpadden fled the scene. Police arrived, but the defendant did not tell them who ran over Edwards. Both Edwards and the defendant were taken to the hospital for treatment. The defendant acknowledged that when he was questioned by Detective Jason Walker of the Decatur police department, he initially lied about the situation but later told officers what had transpired.

The defendant stated that he had received phone calls previous to and after July 18, 2002, "saying it wasn't over and [he] was going to die" if he did not turn over the drugs. During one phone call, the defendant recognized the voice as that of McSpadden. The defendant would sometimes receive multiple calls in one day, but other days he would not receive any. Since July 18, the defendant began carrying a gun.

The defendant related a story that on July 25, 2002, Travis Williams and Andrew Murphy "kidnapped" him at gunpoint and told him to produce 10 pounds of cannabis or money or he would die. The defendant stated that he later escaped.

The defendant testified that on July 31, 2002, Andrew saw him in court and told him, "You better come up with something or I'm going to kill you today." The defendant stated that he was scared, so he left the courthouse and went to his aunt's house. He saw Jarrett Jelks and asked for a ride to the courthouse because he "had a problem with somebody [he had] seen up there, and [he] wanted to go up there and fight—confront him." Upon arriving at the courthouse, he saw Andrew and Leslie leaving in a black car. He told Jelks to "follow the car." The defendant's cellular phone rang, and he answered it. He then told Jelks to proceed down Waggoner Street when the defendant observed Andrew. He acknowledged that he "raised [his] hand over the window out the roof, put [his] head down, and started shooting to scare him. Cause [sic] [he] was in fear of [his] life also."

Officer Keith Mullins of the Decatur police department recovered the car used in the shooting and found two bullet marks the nature and appearance of which suggested that shots were fired from the passenger side to the driver's side. One indentation included a hole leading underneath the car's exterior.

On August 1, 2002, Detective Roger Ryan of the Decatur police department processed and searched the vehicle. The car had what appeared to be two bullet defects in the roof of the vehicle. One defect showed penetration of the roof above and behind the driver's head. Ryan located a .38-caliber bullet between the cushions of the backseat. He found, *inter alia*, a black and yellow Pittsburgh Steelers hat in the backseat behind the driver's side.

Detective Walker testified that he responded to 541 West Waggoner to investigate the crime scene. In a search of the area, he located four spent shell casings with the number "380," which represented the caliber.

Detective Shane Brandel of the Decatur police department was a lead detective in the resulting homicide investigation. On August 4, 2002, he arrested the defendant for the murder of Travis Williams and advised him of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)). The defendant agreed to speak with Brandel and Detective Tim Carlton.

The defendant told them that he had to be in court on the morning of the shooting. He later went to speak to a friend in a different courtroom. Detective Brandel then showed him photographs of the vehicle seized in relation to the shooting. The defendant recognized

the vehicle, stating he had been inside it about a week and a half before the incident. Brandel showed him a picture of the black baseball cap found in the vehicle, without the logo showing. The defendant indicated that it was a Pittsburgh Steelers hat and acknowledged owning such a hat.

The detectives then confronted the defendant as to his participation in the murder. The defendant laughed and denied any knowledge of the shooting, stating he was not involved. During this stage of the interview, the defendant "would sit way back in his chair *** and lean back into the far corner of the interrogation room. He would take his shirt and cover his head with it, and *** pull his hair."

The detectives discussed the incident involving McSpadden and the alleged kidnapping. Shortly thereafter, the defendant stated, "I did not mean to shoot anybody." Shortly thereafter, the defendant confessed to shooting Travis Williams. He identified Travis and Andrew as his kidnappers and claimed that he was kidnapped in retaliation for the theft of 45 pounds of marijuana from McSpadden about 2 weeks prior to the shooting.

The defendant stated that Andrew threatened him at the courthouse on the day of the shooting. He went home but did not call police. He saw Jelks and told him that he "had a problem with somebody at the courthouse and he wanted to go to the courthouse to jump him." The defendant observed Andrew leaving in a small black car and instructed Jelks to follow it. He stated that they followed the vehicle all the way up to Waggoner Street and never lost the vehicle.

The defendant told the detectives that upon pulling onto Waggoner Street, the defendant observed Andrew talking on his cellular phone in the driveway. As his vehicle approached Andrew, the defendant pulled out a gun, stuck his hand out the window of the vehicle, put it over the top of the vehicle, and fired the gun toward Andrew. After he fired the shots, the defendant and Jelks left the area. Jelks dropped him off, and another person immediately picked him up and gave him a ride home.

The defendant told detectives that he later learned about the results of the shooting when he heard sirens sometime after the incident. He did not learn that Travis had been shot until he heard the news that night. He stated that he did not see Travis at the scene and did not know how he got shot. The defendant "cried and showed remorse once he had admitted what had happened." The defendant told the detectives that the night after he found out about the death, he threw the gun he had used into a lake. The gun was never recovered.

The defendant later participated in a videotaped interview and is-

sued a handwritten statement. Detective Brandel indicated that a discrepancy existed between the oral and videotaped interviews. In the oral interview, the defendant gave conflicting statements, first stating that he had shot at Andrew but later stating that he was just shooting to scare him. During the videotaped interview, he stated that he was just shooting "to scare him" and "was not intending to shoot anybody." The handwritten statement indicated that the defendant was sorry he had shot Travis but he did not mean to shoot him.

On January 21, 2003, at a joint trial involving the defendant and Jelks, 10 jurors were seated after the first day of *voir dire*. The trial court noted that the pool of prospective jurors for the day was exhausted. On January 22, 2003, trial reconvened and the court noted that "[t]he entire venire has been either questioned by the [c]ourt in this case and excused or they are presently engaged in other jury trials. The net result is the regular panel has been exhausted but for one juror who we will question in a few minutes." The court provided a copy of section 13 of the Jury Act to counsel and indicated that it would enter an order pursuant to that section directing the sheriff's office to provide 10 additional jurors.

Counsel for the defendant in the instant case objected to the procedure as follows:

> "I think that under the statute what has to occur is for the panel to be exhausted, we should have the opportunity to examine each and every person in the particular entire panel that we have brought in for this week, and what I mean by that is, we have members in other juries that we should be able to have to run through first or go through first to see if we can utilize those people before we go outside of the particular panel brought in for this particular week, and based upon that, I don't think the application of this statute is timely in this case."

The sheriff's office summoned 10 additional jurors for *voir dire*. During the second day of *voir dire*, one juror was impaneled from the original jury pool. The defendant's counsel objected to the procedure used by the sheriff in summoning the new jurors where he utilized persons outside his office to assist in the summoning process and one juror, which the parties later accepted as a member of the jury panel, was given an option to serve rather than a direct order. The defendant had one peremptory challenge remaining after *voir dire*.

The jury convicted the defendant on three counts of first degree murder, and the trial court sentenced him as stated. This appeal followed.

The defendant first argues that (1) the trial court erred by failing to appoint a special bailiff at his counsel's request pursuant to section

13 of the Jury Act (705 ILCS 305/13 (West 2002)) and (2) the sheriff improperly executed the statute by (a) asking persons outside his office to seek venirepersons and (b) allowing prospective jurors to "volunteer" their services.

■ The trial court has broad discretion in the jury selection process (*People v. Robinson*, 299 Ill. App. 3d 426, 439, 701 N.E.2d 231, 242 (1998)), and we will not disturb its decision absent an abuse of that discretion. *People v. Bowen*, 87 Ill. App. 3d 221, 230, 408 N.E.2d 993, 999 (1980). Statutory construction is a matter of law, and the standard of review is *de novo*. *People v. Phelps*, 211 Ill. 2d 1, 12, 809 N.E.2d 1214, 1220-21 (2004). However, whether an irregularity in jury selection under either standard constitutes reversible error generally depends on whether a defendant suffered any prejudice therefrom. See *People v. Lewis*, 165 Ill. 2d 305, 344, 651 N.E.2d 72, 90-91 (1995).

■ Section 13 of the Jury Act provides, in pertinent part:

"When by reason of challenge in the selection of a jury for the trial of any cause, or by reason of the sudden sickness or absence of any juror for any cause, the regular panel is exhausted, the court may direct the sheriff to summon a sufficient number of persons having the qualifications of jurors to fill the panel for the pending trial, but upon objection by either party to the cause to the sheriff summoning a sufficient number of persons to fill the panel, the court shall appoint a special bailiff to summon such person ***. Any person who seeks the position of a juror, or who asks any attorney or other officer of the court or other person to secure his selection as a juryman, shall be deemed guilty of a contempt of court *** and shall thereby be disqualified from serving as a juror for [60] days thereafter ***." 705 ILCS 305/13 (West 2002).

The first question is whether the sheriff was duly appointed to summon additional jurors under section 13 of the Jury Act. The plain language of that provision clearly shows that the trial court was authorized to order the sheriff to summon additional jurors. Only upon objection by a party is the court authorized to appoint a special bailiff to undertake such duties. 705 ILCS 305/13 (West 2002).

The next determination is at what point in the proceedings a party is required to object to the sheriff summoning the jurors and to request a special bailiff. Section 13 requires an objection "to the sheriff summoning a sufficient number of persons to fill the panel." 705 ILCS 305/13 (West 2002); see also *Healey v. People*, 177 Ill. 306, 317 (1898) (section 13 does not authorize a special bailiff "unless one or the other of the parties to the cause objects to the exercise of such power by the sheriff"). A literal reading would mandate an objection to the *appointment* of the sheriff as the person to summon additional jurors, not one

occurring *after* he has already acted. Such an objection should be made at the first available opportunity, either (1) at the time of the appointment (see *Hanna v. People*, 86 Ill. 243, 243-44 (1877)) or (2) if the party was not present when the sheriff was appointed, when the party first learns of the appointment (see *People v. Bedard*, 11 Ill. 2d 622, 627, 145 N.E.2d 54, 57 (1957) (counsel was not in court when the order was issued)). A contrary conclusion would be inconsistent with the plain language of section 13 and would permit a party to take the "wait-and-see" approach, allowing him to object to the sheriff summoning jurors after he observes the makeup of the jurors summoned. We conclude that the legislature did not intend such a result.

■ Here, the defendant and his counsel were present when the trial court appointed the sheriff under section 13 of the Jury Act. While the defendant's counsel had questions about the process, he did not object to the appointment of the sheriff and move for the appointment of a special bailiff until after the sheriff was appointed, his office summoned a number of jurors, those persons were sworn under oath, and *voir dire* of those jurors had begun. The trial court properly found that the objection was untimely and denied the motion for a special bailiff.

■ We next look to the propriety of the method by which the sheriff summoned jurors under section 13 of the Jury Act. The defendant argues that the sheriff improperly relied on persons outside of his office in fulfilling his section 13 duties. Section 13 does not prescribe a specific method by which the sheriff is to retrieve additional jurors other than the fact that those jurors must be qualified to serve. 705 ILCS 305/13 (West 2002). The statute indicates, however, that the sheriff is subject to the direction of the trial court in performing these duties. 705 ILCS 305/13 (West 2002).

Here, the trial court found that the sheriff's method of summoning jurors, which involved calling county supervisors and asking them to provide jurors, was not improper but, rather, was within the discretion afforded the sheriff by section 13 and the court. On this record, we cannot say that this decision was an abuse of discretion.

■ The defendant also argues that Amy Carter, who was the lone person impaneled as a juror from among those summoned by the sheriff, improperly "volunteered" for jury duty in violation of section 13 of the Jury Act. Section 13 bars the action of one who "seeks the position of a juror, or who asks any attorney or other officer of the court or other person to secure his selection as a juryman." 705 ILCS 305/13 (West 2002). The plain language shows that the provision was meant to prevent persons from *actively seeking* to serve on a jury. Accepting an option from another to serve on a jury, as in this case, is not contemplated by the statute and is not prohibited thereby.

Regardless of the method used to secure additional prospective jurors, "reversal is not required unless it appears that the defendant has in some way been prejudiced." *Lewis*, 165 Ill. 2d at 344, 651 N.E.2d at 90-91; see also *Siebert v. People*, 143 Ill. 571, 576, 578, 32 N.E. 431, 432 (1892) (trial court's order that the clerk draw names of 100 additional jurors from the jury box, instead of directing the sheriff to summon jurors, as required by section 13, was not reversible error absent showing of prejudice to the defendant).

The record is clear that only Carter was impaneled as a juror from those summoned by the sheriff. Even though the defendant was aware of the method by which the sheriff summoned additional jurors and of the circumstances by which Carter exercised the option to serve as a juror, he neither exercised his remaining peremptory challenge nor requested that Carter be excused for cause. Instead, he tendered Carter and accepted her as a member of the jury. "The failure to challenge a juror for cause or by peremptory challenge waives any objection to that juror." *People v. Collins*, 106 Ill. 2d 237, 271, 478 N.E.2d 267, 282 (1985).

Further, "[w]here neither party has exercised a peremptory challenge against a potential juror, the decision whether to accept the potential juror as an impartial trier of fact is discretionary with the trial judge." *People v. Hobley*, 159 Ill. 2d 272, 301, 637 N.E.2d 992, 1005 (1994). Here, the trial court did not abuse its discretion in accepting Carter as an impartial trier of fact where the record fails to show she would be otherwise. The defendant points to no fact showing how Carter would be other than fair and impartial other than the argument, rejected above, that she "volunteered." The defendant's allegation that at least some of the additional jurors were "friendly with the State or the Sheriff" is irrelevant where he fails to show Carter had such relationship and where the other jurors summoned were not impaneled.

The defendant fails to show that he was prejudiced by a deviation, if any, from the procedure set forth in section 13 of the Jury Act. Accordingly, his argument as to irregularities in the jury selection process must fail.

■ The defendant also argues that the trial court erred in denying his motion for jury instructions on the justifiable use of force in self-defense and the second degree mitigating factor of sudden and intense passion or provocation. Ordinarily, the standard when reviewing the trial court's decision to issue a tendered jury instruction is whether the court abused its discretion. *People v. Castillo*, 188 Ill. 2d 536, 540, 723 N.E.2d 274, 276 (1999). However, "[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling him to

instructions on an affirmative defense." *People v. Everette*, 141 Ill. 2d 147, 157, 565 N.E.2d 1295, 1299 (1990). A defendant is entitled to have the jury instructed on the law applicable to his theory of the case, provided that evidence in the record supports that theory. *People v. Williams*, 193 Ill. 2d 306, 375, 739 N.E.2d 455, 491 (2000).

Objective self-defense is an affirmative defense and the elements are as follows: (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, and (4) the use of force was necessary. *People v. Dillard*, 319 Ill. App. 3d 102, 106, 745 N.E.2d 185, 188 (2001).

The record on appeal does not contain even a scintilla of evidence that either Travis or Andrew presented an imminent threat of death or great bodily harm to the defendant. Further, even under the defendant's explanation of the facts, he was the undisputed aggressor at the time and place of the shooting. Accordingly, the trial court did not abuse its discretion in refusing to issue an objective self-defense jury instruction.

The defendant also contends that, even though the trial court instructed the jury on the second degree mitigating factor of subjective or imperfect self-defense, the court erred in refusing to instruct the jury on the additional second degree mitigating factor of sudden and intense passion by provocation.

Section 9—2 of the Criminal Code of 1961 (Criminal Code) states that a crime is second degree murder when the State proves the elements of first degree murder beyond a reasonable doubt but a mitigating factor exists. 720 ILCS 5/9—2 (West 2002). To be entitled to an instruction on the mitigating factor under section 9—2(a)(1) of the Criminal Code (720 ILCS 5/9—2(a)(1) (West 2002)), some evidence must show that, at the time of the killing, the defendant was acting under a sudden and intense passion that resulted from serious provocation. *People v. Yarbrough*, 269 Ill. App. 3d 96, 100-01, 645 N.E.2d 423, 426 (1994).

To constitute serious provocation, the provocation must fit within certain recognized categories. Illinois courts have traditionally recognized four different categories of serious provocation: (1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *People v. Blackwell*, 171 Ill. 2d 338, 358, 665 N.E.2d 782, 791 (1996). The trial court here found that "[t]here is no evidence, at all, supporting a mitigated homicide regarding sudden and intense [s]econd [d]egree [m]urder. There is no evidence, at all, that fits the traditional categories where that's an appropriate instruction or offense for a jury to consider." We agree with the trial court.

The defendant does not argue on appeal which recognized category his situation involves; rather, he argues that he was living under a "cloud of fear" and that the threat against him on the morning before the shooting was "[t]he weighty straw that broke this already belabored camel's back." We first note that mere words are insufficient to constitute serious provocation. *Blackwell*, 171 Ill. 2d at 358, 665 N.E.2d at 791. Second, the defendant's reliance on *People v. Parker*, 260 Ill. App. 3d 942, 632 N.E.2d 214 (1994), for his "cloud-of-fear" argument is misplaced. The circumstances in *Parker* involved a defendant seizing cocaine and a beeper from his son, which caused a heated argument in the street and a shoving match. The son pulled a gun, and the pair struggled over control of the weapon. The defendant then pulled out a knife and stabbed his son, which the defendant alleged was in defense of himself. *Parker*, 260 Ill. App. 3d at 944, 632 N.E.2d at 216. While the defendant in the instant case relies on the "cloud-of-fear" language used by the *Parker* court, that court did not base its finding that a provocation instruction was warranted based on that fact. Rather, it found that "mutual combat provides adequate provocation for the mitigating mental state of acting under sudden and intense passion." *Parker*, 260 Ill. App. 3d at 947, 632 N.E.2d at 218.

Nor do we find in our review of the record that the defendant's situation falls under any of the legally recognized categories of provocation. The only category under which the defendant might have remotely suffered legal provocation was when he was allegedly kidnapped. However, the record contains no evidence to suggest that the incident aroused any sudden and intense passion, especially where a full week passed before the defendant took any action at all (see generally *People v. Mitchell*, 73 Ill. App. 2d 35, 42, 220 N.E.2d 19, 22-23 (1966) (mitigation of murder charge based on violent, irresistible passion was improper where the interval between the provocation and the killing was sufficient for the voice of reason and humanity to be heard)). The trial court did not abuse its discretion in refusing to issue a jury instruction on the second degree mitigating factor of serious provocation where the evidence did not warrant such an instruction.

The defendant next argues that he was not proved guilty beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

916

■ Here, the evidence showed that the defendant had been regularly carrying a gun since July 18, 2002. He directed Jelks to drive him to the courthouse where he had seen Andrew earlier so he could "jump" him. When the defendant saw Andrew leave in a car, he directed Jelks to follow the car. They lost sight of the car but then drove to 541 West Waggoner, the home of Travis Williams. The defendant saw Andrew walking across the street to the house, which was on the left side of the street. Travis was standing on the porch. As the defendant's car drove by, he reached out of the passenger-side window and aimed the gun to the left and fired four shots, killing Travis. The car sped off, and the defendant had Jelks drop him off. Another acquaintance of the defendant picked him up immediately thereafter and transported him home. Under these facts, any rational trier of fact could find the essential elements of first degree murder beyond a reasonable doubt.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

COOK and APPLETON, JJ., concur.