THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVELLE COTTON, Defendant-Appellant.

First District (1st Division)   No. 1—06—3354

Opinion filed July 20, 2009.—Rehearing denied August 21, 2009.

238

Patricia Unsinn and Adrienne River, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Samuel Shim, and Michael Colonna, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

The defendant, Lavelle Cotton, was charged with murder, attempted murder and aggravated discharge of a firearm in connection

with the death of Timothy Thigpen. Following a jury trial, the defendant was found guilty and sentenced to a term of 60 years for murder and 10 years for aggravated discharge of a firearm. The defendant appeals his convictions and sentences.

On appeal, the defendant raises the following issues: (1) whether Aaron Cotton's testimony pursuant to a plea agreement denied the defendant due process; (2) whether the jury was improperly instructed on felony murder under the facts of this case; (3) whether the defendant's constitutional right to be present at his trial was violated; (4) whether the trial court erred in imposing the sentences in this case; and (5) whether the mittimus must be corrected. We affirm but modify the mittimus.

## BACKGROUND

On November 15, 2002, Mr. Thigpen was a passenger in a van (the Diggs van) driven by Jeremell Diggs. Samuel Clark, Curtis Hicks, Venitta Page and Keshia Johnson were also passengers in the van. Shots were fired from another van into the Diggs van, striking and killing Mr. Thigpen. The defendant and his brother, Aaron Cotton, were later identified as the passenger and the driver of the van from which the shots were fired.

The defendant and Aaron were charged, *inter alia*, with first degree murder in connection with Mr. Thigpen's death under theories of intentional or knowing murder, murder by creating a strong probability of death or great bodily harm and felony murder based on the discharge of a firearm. The defendant and Aaron were also charged with attempted first degree murder and aggravated discharge of a firearm as to other individuals in the Diggs van.

The trial court severed the cases against the defendant and Aaron. After jury selection and prior to opening statements, the prosecutor informed the trial court that a plea agreement had been reached with Aaron. The trial court denied the defendant's motion for a mistrial. The court then accepted a guilty plea from Aaron. Thereafter, the trial court granted the defendant's renewed motion for a mistrial.

At the defendant's second trial, the following testimony pertinent to the issues raised on appeal was heard by the jury.

## I. For the State

Samuel Clark testified that, on November 15, 2002, he was a passenger in a van owned and driven by Mr. Diggs. The other passengers were Curtis Hicks, Venitta Page, Keshia Johnson and Mr. Clark's brother, Mr. Thigpen. Around 2 p.m., Mr. Diggs stopped at a gas station to buy gas; the passengers got out to make purchases of snacks. Mr. Clark saw a tan and brown van (the Norris van) stopped at the

stoplight at the corner. He recognized the van as belonging to a friend of his named Norris. He attempted to signal the driver because he wanted Norris to do some work for him. As he approached the van, he recognized the driver as Essay. Essay's real name was Aaron. Aaron's brother, Red, was also in the van. Mr. Clark identified the defendant as "Red." Mr. Clark knew both men from the neighborhood. Mr. Clark returned to the Diggs van.

As the Diggs van made a right turn out of the gas station onto State Street, Mr. Clark heard a shot. It sounded like it came from behind the van. As he looked back he saw the defendant hanging out the side window of the Norris van, shooting; Mr. Clark could see fire coming out of the barrel. There were too many shots to count. The Norris van followed the Diggs van as it proceeded south on State Street; shots continued to be fired from the Norris van. Mr. Clark heard Mr. Thigpen say that he was hit. Mr. Diggs then drove to Roseland Hospital. After leaving Mr. Thigpen at the hospital, Mr. Clark retrieved his own car and drove to the Norris residence to confirm who was driving the Norris van.

On cross-examination, Mr. Clark testified that he knew the defendant when he saw him with Aaron. He acknowledged that he did not stop to tell the police officers at the hospital who fired the shots at the Diggs van. He went to see Norris to make sure who was in the Norris van. He acknowledged that he did not speak to the police until the 18th or 19th of November. On redirect, Mr. Clark confirmed that the defendant was shooting from the passenger side of the Norris van. On re-cross-examination, Mr. Clark maintained that on November 18 he told Detective Fidyk that he saw the defendant shooting at the Diggs van.

Phillip Armstrong, a Chicago police officer, testified that on November 15, 2002, his partner, Officer Lanier Payne, and he were dispatched to Roseland Hospital to relieve another police unit that had been investigating a shooting. At the hospital, Officer Armstrong met Ms. Johnson and Ms. Page. As Mr. Thigpen was being transferred to Christ Hospital, the officers gave the women a ride to that hospital. The women were very upset and concerned about their friend. There was no opportunity to interview them about the shooting.

On cross-examination, Officer Armstrong testified that Ms. Johnston and Ms. Page did not tell him who the offenders were but that did not mean they did not know their identities. The women did not give him a description of the offenders.

Dr. Scott Denton, deputy chief medical examiner for Cook County and a forensic pathologist, testified that he conducted an autopsy on the body of Timothy Thigpen. Mr. Thigpen died from a gunshot wound

to the head; the gunshot wound to his thigh was nonfatal. The death was certified as a homicide.

Aaron Schrod Cotton, the defendant's brother, testified that he was originally charged with Mr. Thigpen's murder and with attempted murder and aggravated discharge of a firearm in connection with other passengers in the Diggs van. According to a plea agreement reached with the State, Aaron pleaded guilty to conspiracy to commit murder for a recommended sentence of 12 years' imprisonment. Under the agreement, the State agreed to dismiss a pending robbery charge and place him in the State's Attorney's witness protection unit at the Cook County jail.[1] Under the agreement, Aaron would be placed in protective custody in the Department of Corrections. Aaron acknowledged that in exchange, he had agreed to testify truthfully in this case. He understood that if he did not testify truthfully, "the deal would be void." He understood that all of the dismissed charges would be reinstated. Aaron acknowledged his signature on the written plea agreement. Aaron further acknowledged that he had previous convictions for possession of a controlled substance and possession of cannabis. Aaron then testified as follows.

On November 15, 2002, at approximately 12 noon, Aaron borrowed a van from Norris Davidson. About an hour later, he picked up the defendant. The defendant sat in the front passenger seat while Aaron drove. They drove around for 45 minutes to an hour listening to the radio and talking.

Around 2 p.m., Aaron was proceeding east on 111th Street. While stopped in traffic waiting for the stoplight to change, Aaron looked over at the B.P. gas station on the corner and observed Mr. Clark gesturing to him. Mr. Clark walked to the sidewalk. When Aaron waved back at him, Mr. Clark threw his hand up and turned back. Aaron continued east on 111th Street but decided to return to the B.P. station to buy cigarettes. While trying to find a place to park at the gas station, he almost collided with a gray/black van.[2] While trying to park the van, Aaron noticed a man standing by the ice machine.

As the black/gray van was attempting to turn on to State Street, it stopped suddenly. Again, Aaron almost collided with it. While looking to see what had caused the black/gray van to stop suddenly, Aaron saw that the defendant had taken a gun from his waistband. Aaron was not aware that the defendant had a gun in his possession that day.

---

[1]At the time he testified, Aaron was no longer in the protection unit because he made an unauthorized telephone call.

[2]The Diggs van was described by the various witnesses as black and gray or black and silver.

The defendant lowered the window and began to fire, shooting at the black/gray van directly in front of them. As the black/gray van turned and drove south on State Street, Aaron followed them. The black/gray van went through a red light at 111th Street; Aaron followed it through the red light. The black/gray van turned west on 112th, a one-way street going east. Aaron followed the black/gray van the wrong way down 112th Street. When he got to Michigan Avenue, the defendant told him to let him out. The defendant took the gun with him. Aaron then drove north on Michigan Avenue.

Aaron parked the Norris van on Emerald Avenue. He flagged down a friend who drove him to Roseland Hospital. There he observed the black/gray van in the parking lot and recognized Mr. Clark's friends. After learning of Mr. Thigpen's death, he took the Norris van to a scrap yard and had it crushed. He retrieved the gun and disposed of it in a lake near Hammond, Indiana. He told Norris Davidson that he would pay him for the van and asked him to tell the police the van had been sold or stolen.

On cross-examination, Aaron denied telling defense counsel that he had seen Willie Diggs at a car wash on November 15, 2002. He denied that Mr. Diggs had told him that "guys were looking" for him. Aaron denied that he shot at the black/gray van. He denied disposing of the van and the gun to cover up what he had done and denied that he had been trying to blame the defendant for the shooting for a long time. He acknowledged that he had not told the truth until the State's offer; he just kept quiet. He maintained that his agreement was for truthful testimony.

During cross-examination, Aaron was questioned by defense counsel as follows:

"You indicated on direct that you know you have to testify for the [S]tate's [A]ttorney in order to get the deal that you worked out on July 5 of 2006, isn't that true?

A. I got to testify truthfully to the events that happened that day.

Q. You have to testify consistent with the statement that you wrote out on July 6th of 200—or July 5th of 2006, isn't that true?

A. I mean you—If you word it like that that's the way you word it, but I just got to do truthful testimony of what happened today.

Q. This is the statement that you gave the State on July 5th of 2006?

A. Yes, that's the statement.

Q. And this is the statement that you gave them when you were trying to work out your deal?

A. No. That was the statement that I gave them.

Q. And it was after you gave them this statement that they agreed to reduce a different—or dismiss robbery charges against you, is that true?

A. Yes.

Q. And they also agreed to reduce the murder charges to conspiracy?

A. Yes."

Keshia Johnson testified that, on November 15, 2002, she was with Samuel Clark, Curtis Hicks, Jermell Diggs, Venitta Page and Timothy Thigpen in Mr. Diggs's van. Mr. Diggs stopped the van at a gas station. Everyone but Ms. Johnson went into the gas station. When they returned, Mr. Clark commented about another van, causing everyone to look at that van. Ms. Johnson observed Aaron driving that van and that Aaron's brother, Red, was on the passenger side. Ms. Johnson had known Aaron for 10 to 15 years. Red's real name was Lavelle. Ms. Johnson identified the defendant as Red or Lavelle. Ms. Johnson recognized the van that Aaron was driving as belonging to a man named Norris.

By this time a man was trying to sell Mr. Diggs a gold chain. Mr. Diggs decided to drive to a store at 111th Street and Michigan Avenue to determine if the chain was real. As Mr. Diggs was pulling out of the gas station, he saw that the man with the chain was not following him, so he doubled back. After discovering that the chain had been sold to someone else, Mr. Diggs drove out of the gas station. At the end of the driveway, Ms. Johnson heard shots; everyone in the Diggs van looked back. Ms. Johnson saw two people on the passenger side of the Norris van shooting out of the window at the Diggs van. After the Diggs van turned south on State Street, Ms. Johnson was able to see the defendant shooting out of the passenger side of the Norris van.

Ms. Johnson further testified that, after the shots stopped, the passengers in the Diggs van discovered that Mr. Thigpen had been shot. Mr. Diggs then drove to Roseland Hospital. At Roseland Hospital, Ms. Johnson spoke with two police officers about the shooting but did not tell them everything. She did not tell them the identity of the shooter because she was only concerned with the condition of Mr. Thigpen. At Christ Hospital, she had a short conversation with Detective Fidyk. He told her he would get back to her later.

On December 12, 2002, Ms. Johnson met with Detective Fidyk and Assistant State's Attorney O'Grady. The next day, she identified the defendant in a lineup as the person shooting from the Norris van.

On cross-examination, Ms. Johnson denied telling the police officers that she did not know who the shooters were or that she could not give them a description. She acknowledged that she did not tell Detective Fidyk at Christ Hospital that she saw the defendant shooting. She denied that she did not know who the shooters were. She did not go to the police prior to December 12, 2002, because no one came to talk to

her prior to that date. She denied that she did not go to the police because she did not know who the shooters were. No one ducked when the first shot was fired; everyone in the Diggs van looked back.

Ms. Johnson acknowledged that she knew from speaking to Mr. Clark that Norris Davidson had lent his van to Aaron. She denied that it was as a result of that conversation she decided Aaron and the defendant were involved in the shooting of Mr. Thigpen and caused her to identify the defendant in the lineup.

Venitta Page's testimony as to the events of November 15, 2002, was consistent with that of Ms. Johnson. As Mr. Clark was returning to the Diggs van, Ms. Page observed Aaron as the driver and the defendant as the passenger in the Norris van. As Mr. Diggs drove his van out of the gas station, Ms. Page observed shots coming from the passenger side of the Norris van. She saw the passenger with his arm outside the window holding a gun and firing at the Diggs van. She could not see who the passenger was, but it had only been three or four minutes since she had seen Aaron and the defendant in the Norris van. She did not observe Aaron or the defendant exit the Norris van, and she never saw anyone else enter the Norris van.

Ms. Page did speak to two police officers who drove her from Roseland Hospital to Christ Hospital. But she was more concerned with Mr. Thigpen's condition than the events of the shooting. At Christ Hospital, her conversation with Detective Fidyk was brief; she understood they would speak at a later time. On December 12, 2002, she spoke with Detective Fidyk and Assistant State's Attorney (ASA) O'Grady. On December 13, she identified the shooter in a lineup.

On cross-examination, Ms. Page acknowledged that when the police officers asked her if she knew who had done the shooting, she did not tell them. She told them she was too upset to talk. She maintained that she did not talk to Detective Fidyk at all that day but acknowledged that she had given him information about other aspects of the shooting. She further acknowledged that while she had his business card, she never called the detective.

Describing herself as "nosy," when the first shot was fired, Ms. Page turned around and looked behind to see from where the shot had been fired. Then she ducked down. Mr. Clark never told her that he had spoken to Norris Davidson and found out that Aaron had borrowed his van. Eventually, she had a conversation with Mr. Clark about what Norris Davidson had told him.

Curtis Hicks's testimony was consistent with that of Ms. Johnson and Ms. Page about the events surrounding the shooting of Mr. Thigpen, though according to Mr. Hicks, Mr. Diggs did not go into the gas station. Mr. Hicks was seated in the front passenger seat of the Norris

van. When the shots began, he looked in the rearview mirror and observed a brownish-tan van behind the Diggs van which he recognized as Norris Davidson's van. Mr. Hicks was able to get a good look at the passenger in the Norris van. He identified the defendant as the passenger. Mr. Hicks observed the defendant leaning out of the window firing a gun. Mr. Hicks stated to the other passengers in the Diggs van that it was the defendant who was shooting at them. Later that night, he was interviewed by police but was too upset to tell them much at that time.

On December 10, 2002, Mr. Hicks viewed a lineup and identified the defendant as the person who shot Mr. Thigpen. On December 12, 2002, Mr. Hicks spoke with Detective Rokativich and ASA O'Grady and signed a statement prepared by ASA O'Grady. He later testified before the grand jury.

On cross-examination, Mr. Hicks acknowledged that, on November 15, 2002, he told Detective Nega that he only heard the shots and did not see the shooter. He explained that he was upset seeing Mr. Thigpen, whom he had known as a kid, die. He denied talking to Mr. Clark or anyone else. Prior to December 12, he did not tell Detective Nega what he was now testifying. Mr. Hicks acknowledged that he had previous convictions for drug possession.

Gregory J. Fields testified that he was in the Cook County jail charged with possession of a controlled substance. He was also on parole in connection with a theft conviction. He had a 1997 conviction for possession of a controlled substance. He denied that any promises had been made to him in exchange for his testimony in this case.

Mr. Fields testified that on November 15, 2002, he was at the Amoco gas station at the corner of 111th Street and State Street, standing by the ice machine. He was trying to make money by pumping gas for people. He observed a black/silver van and a gray/burgundy van; he did not recognize either van. However, he identified the occupants of the gray/burgundy van as "SA" and Red. Mr. Fields identified the defendant as Red. The defendant was seated on the passenger side of the gray/burgundy van. As he watched, the black/silver van started to pull out going south on State Street followed by the gray/burgundy van. Mr. Fields heard a shot, which shook him up. He saw another shot break the glass on the right side of the black/silver van. He heard another shot and saw both vans go through a stoplight. The shots came from the passenger side of the gray/burgundy van where the defendant was sitting.

Mr. Fields spoke to detectives the night of the shooting. He identified a photograph of the defendant. On December 11, 2002, he spoke to detectives again. Early the next morning, he signed a statement

prepared by ASA O'Grady, summarizing what he had told ASA O'Grady. On December 30, 2002, he testified before the grand jury.

Mr. Fields further testified that, just after Thanksgiving, he observed the defendant in the vicinity of the Amoco station. The defendant asked him if he had seen anything to do with the shooting. The defendant denied being involved in the shooting. When the defendant asked if he had spoken to anyone about the shooting, Mr. Fields told him that he had not.

On cross-examination, Mr. Fields acknowledged that he told detectives the shooting occurred around 3:15 p.m. He saw the two vans beginning to exit the gas station parking lot. He did not see the two vans almost collide. He told the police that he heard three shots and that he saw the person who was shooting. He acknowledged that he smoked crack cocaine and that he was pumping gas to get money to buy some drugs. He had smoked crack cocaine early that morning.

Mr. Fields maintained that no one promised him anything for his testimony. He was testifying in this case because, if it had happened to one of his family members, he would want someone to speak up about it.

Mr. Fields acknowledged that on May 14, 2006, he was interviewed by investigators from the public defender's office. He did not recall telling them that he did not see Red with a gun. He did tell them that it looked like the shots were coming from the driver's side of the van. He had initially thought that until he saw the defendant leaning out of the passenger side window and saw the gun. He acknowledged signing a statement that he did not see Red with a gun and that the shots were coming from the driver's side of the van. On redirect examination, Mr. Fields acknowledged telling the grand jury that he knew it was the defendant doing the shooting because the defendant looked him "dead in the face" as he was coming into the gas station and he had a good opportunity to observe the defendant as he leaned out of the van window during the shooting.

Detective David Fidyk testified that, on November 15, 2002, he was assigned to investigate the shooting in this case. He spoke briefly with Ms. Page and Ms. Johnson at Christ Hospital. Both women were very upset. He gave them contact information and told them he would contact them later. He returned to Area 2, where Mr. Hicks and Mr. Fields were waiting. After speaking to Mr. Fields, he was looking for the defendant as an offender in this case. On November 18, 2002, he spoke to other witnesses. After speaking to Mr. Clark, the detective began looking for Aaron. Even though the defendant had been identified on November 15, the investigative alert did not go out until December 6 because the police were looking for more evidence to support their case.

On cross-examination, Detective Fidyk testified that at the November 15, 2002, interview with Ms. Page and Ms. Johnson, the women were able to give him information about the shooting but did not tell him who the shooter was. Afterwards, neither of the women contacted him. When the detective interviewed Mr. Clark on November 18, 2002, Mr. Clark did not tell him that the defendant was the shooter. The detective acknowledged that, in his November 15, 2002, conversation with him, Mr. Fields did not tell him that he saw the defendant shooting.

The defendant's motion for a directed verdict was denied.

## II. For the Defendant

Francesca Williams testified that the defendant is the father of her daughter. On November 15, 2002, the defendant was at Ms. Williams's parents house with the witness and their daughter until 6 p.m. or 6:30 p.m. when they left to go to a liquor store. She remembered that was November 15 because it was the defendant's brother Antonio's birthday, and they were supposed to go to the defendant's mother's house to celebrate. Ms. Williams's father was also present in the house but was sleeping. Ms. Williams's mother worked at Roseland Hospital and left work at 2 p.m. Roseland Hospital was two or three blocks from the house; her mother was home by 2:10 p.m. or 2:15 p.m. Ms. Williams maintained that the defendant did not leave the house without her on November 15, 2002.

On cross-examination, Ms. Williams testified that the defendant, their daughter and she spent November 15, 2002, in their room in her parents' house. She did take her daughter into the living room to watch television. The defendant and she remained in their room watching regular programs such as "Maury" and talk shows. She told the first detective she spoke with that they watched regular programs and then some movies on a DVD player. They finished watching the movies between 1:30 p.m. and 2 p.m. Her mother came in as the movie was ending. She knew her mother got home at 2:10 p.m. or 2:15 p.m. because that was the time she usually returned home from work.

Cynthia Williams, Francesca's mother, testified that, on November 15, 2002, she worked from 6 a.m. to 2 p.m. After work, she returned home. The defendant, Francesca and her granddaughter were there; her husband was home but asleep. Between 5:30 p.m. and 6 p.m., Mrs. Williams went out with her sister and brother-in-law, Michelle and Jermaine Louis, to the Ford City shopping mall. She remembered the time because they had to wait for Mr. Louis to finish work as neither woman drove.

On cross-examination, Mrs. Williams acknowledged that, on December 12, 2002, she spoke to ASA Julie Egan and Detective Scott Rokativich at Area 2. ASA Egan prepared a written statement summarizing what Mrs. Williams told them. Mrs. Williams testified that she did not read the written statement because she was nervous and just wanted to leave. She acknowledged that her signature appeared on the pages of the statement. She further acknowledged that she was given the statement to read and offered the opportunity to make any changes or corrections.

According to the statement, Mrs. Williams told ASA Egan and Detective Rokativich that when her shift ended at 2 p.m., she thought she went shopping with her sister because Mrs. Williams received her paycheck that day.[3] According to Mrs. Williams, she returned home sometime after 3 p.m. though she could not remember the exact time.

Mrs. Williams maintained that she had told the ASA and the detective that she went shopping at 5:30 p.m. or 6 p.m. when her brother-in-law finished work. She denied telling them that she went shopping and returned home at 3 p.m. She explained that it was the police officer that suggested she went shopping around 2 p.m. and 3 p.m. He also suggested that Mrs. Williams state that she left work around 3 p.m. Mrs. Williams told him that was not true. She did not remember the ASA reading her statement to her.

Mrs. Williams further testified that, at the time she gave her statement, she knew that the defendant had been arrested in connection with a murder. After she gave her statement, she asked if the defendant would be released. When she was told he would not be released, she reminded the officer that she had just told him that the defendant was home. A year later she read her statement. She just signed the statement because she was afraid for her children.

On redirect examination, Mrs. Williams testified that, prior to being called to testify before the grand jury, she was questioned by a police officer. She told the officer that she did not go shopping until after her brother-in-law picked her up. She gave the officer her sister and brother-in-law's names, and the police followed up with them. After she told the police that she did not go shopping until 5:30 p.m. or 6 p.m., she did not testify before the grand jury but was told to go home.

Jermaine Louis testified that, on November 15, 2002, he left work at 3:30 p.m. and went to Mrs. Williams's house with his wife Michelle. They arrived there at about 5:30 p.m. He knew it was 5:30 p.m. because he looked at his watch. Michelle, Mrs. Williams and he then

---

[3]According to her written statement, it was her sister's payday.

went Christmas shopping. On cross-examination, Mr. Louis testified that he did not know what the defendant was doing at 2:15 p.m. on November 15, 2002.

The parties stipulated that if Detective Jay Nega were called as a witness, he would testify that he interviewed Curtis Hicks. Mr. Hicks told him he did not see the shooter; he only heard shots and saw the victim fall. Detective Nega would further testify that Gregory Fields told him that he heard three gunshots and ran into the store.

## III. Rebuttal

Sergeant Scott Rokativich testified that he was present with ASA Egan during the interview with Mrs. Williams. Sergeant Rokativich testified that Mrs. Williams never stated that she arrived home from work at 2:10 p.m. on November 15, 2002, and never stated that Francesca and the defendant were present in the house. He denied telling Mrs. Williams to put in her statement that she arrived home after 3 p.m. on that date. On cross-examination, Sergeant Rokativich acknowledged that ASA Egan wrote out the statement for Mrs. Williams to sign.

ASA Julie Egan testified that, on December 12, 2002, she interviewed Mrs. Williams. At the conclusion of the interview, Mrs. Williams agreed to have what she told the ASA memorialized in a written statement. ASA Egan asked Mrs. Williams specific questions and wrote down her answers. ASA Egan read the statement aloud line by line with Mrs. Williams reading along with her. In the interview, Mrs. Williams told her that at 2 p.m. on November 15, 2002, she thought she went shopping with her sister because it was her sister's payday. She thought she returned at about 3 p.m. but could not remember the exact time. Mrs. Williams requested that "at about" be deleted. ASA Egan crossed out "at about" and initialed it so it read "sometime after 3 p.m." Mrs. Williams never stated that she returned home at 2:10 p.m. Sergeant Rokativich never suggested to Mrs. Williams that she should just say she returned home sometime after 3 p.m.

The jury returned a verdict finding the defendant guilty of first degree murder and aggravated discharge of a firearm. The jury found that, during the commission of the murder, the defendant personally discharged a firearm that proximately caused the death of Mr. Thigpen and that the offense was committed as the result of the intentional discharge of a firearm by the defendant.

Following the denial of the defendant's motion for a new trial, the trial court held a sentencing hearing. The State offered three victim impact statements from Mr. Thigpen's grandmother, his mother and

Ms. Page. The State also pointed out that the defendant had been a good student, had participated in extracurricular activities and had not been subject to emotional, physical or sexual abuse. He had a prior criminal history for drug-related offenses. Since the defendant maintained that he never used alcohol or drugs, the State argued that he made a conscious choice to fire shots into the Norris van. Therefore, the State requested an extended-term sentence for murder and the maximum or close to the maximum on his conviction for aggravated discharge of a firearm.

In mitigation, the defendant presented the testimony of several witnesses. Barbara Ann Pippen testified that the defendant was the father of her 18-year-old grandson, Maurice. The defendant took Maurice to school and helped him with his homework. The defendant had also advised Maurice not to get involved with gangs. Loula Freeman testified that she had known the defendant for 30 years and that he was a very respectful young man. Chevell Alberts, a corrections officer at the Cook County jail, testified that the defendant was on the Christian-living tier at the jail. Based on her interaction with the defendant at the jail, she maintained that the defendant had potential for rehabilitation. According to Ms. Alberts, anyone could be rehabilitated if he or she had the desire and the support to do so. She believed that the defendant had the desire to change his life and behavior.

The parties stipulated that if Deputy Vassil, a corrections officer, were called as a witness, he would testify that the defendant had never been a disciplinary problem and had potential for rehabilitation. The defendant declined to address the court.

In imposing the sentences in this case, the trial court referred to the testimony of the corrections' officers which indicated that the defendant was "seeking rehabilitation in many ways." Noting the defendant's four prior convictions for drug possession, the trial court questioned the defendant's assertion that he never tried illegal drugs. The trial court further noted that the defendant's actions in this case forever changed the life of his brother Aaron and that the defendant was not provoked in any way to fire on a van full of people. Based on the testimony of the witnesses, the trial court believed that it was "nothing short of a miracle that only one person was killed by [the defendant's] actions."

The trial court then sentenced the defendant to a term of 60 years' imprisonment on the murder conviction and 10 years' imprisonment on the aggravated discharge of a firearm conviction, to be served consecutively to the 60-year sentence.

The defendant filed a motion to reduce his sentence, After the denial of the motion to reduce sentence, the defendant filed a timely notice of appeal.

## ANALYSIS

### I. Plea Agreement

The defendant contends that he was denied due process when Aaron Cotton testified pursuant to a plea agreement he entered into with the State. He further contends that he was denied due process when the prosecutor failed to correct Aaron's statement that the plea agreement was void if he testified untruthfully.

The plea agreement provided in pertinent part as follows:

"Aaron Cotton was advised that he has been offered the following in exchange for his truthful testimony in the case of *People v. Lavelle Cotton*, No. 03 CR 3262

\* \* \*

In exchange for this consideration[,] Aaron Cotton will[:]

1. Plead guilty to the Charge of Conspiracy to Commit Murder and swear to the facts contained in this plea agreement.

Aaron Cotton understands that he will be sentenced by the Court after he testifies. Aaron Cotton further understands that if he fails to testify to the facts contained in this document, the deal will be revoked and all charges pending against him in Case No. 03 CR 3262 will be reinstated."

### A. *Standard of Review*

"The standard of review for determining whether an individual's constitutional rights have been violated is *de novo.*" *People v. Burns*, 209 Ill. 2d 551, 560, 809 N.E.2d 107 (2004), but see *People v. Campos*, 349 Ill. App. 3d 172, 174-75, 812 N.E.2d 16 (2004) (noting that the supreme court applied an abuse of discretion standard to review a trial court's decision to disqualify a defendant's chosen counsel).

### B. *Discussion*

### 1. Forfeiture of Issue

The defendant concedes that defense counsel failed to object to Aaron's testimony on due process grounds. Defense counsel also failed to raise the issue in the defendant's posttrial motion. Therefore, the defendant has forfeited review of the issue. *People v. Medina*, 221 Ill. 2d 394, 402, 851 N.E.2d 1220 (2006). The defendant requests that this court review his allegation of error under the plain error doctrine. 134 Ill. 2d R. 615(a). The first step in a plain error analysis is to determine if error occurred. *People v. Hudson*, 228 Ill. 2d 181, 191, 886 N.E.2d 964 (2008).

## 2. Denial of Due Process

Under "consistency agreements," a witness is required to testify "consistently" with statements previously made to the State in order to secure the benefits of a plea bargain. Prior to this court's decision in *People v. Bannister*, 378 Ill. App. 3d 19, 880 N.E.2d 607 (2007), *appeal allowed*, 227 Ill. 2d 584, 888 N.E.2d 1185 (2008), Illinois courts had not considered whether a defendant's due process rights were violated by the existence of a consistency provision in the witness's plea agreement. *Bannister*, 378 Ill. App. 3d at 31.

In *Bannister*, the plea agreement required the codefendant "to testify truthfully" in exchange for the vacatur of two murder convictions and dismissal of another murder charge and he would be allowed to plead guilty to one count of murder for which the State would recommend a sentence of 60 years' imprisonment. The agreement also provided that the witness promised "to testify in a manner that was consistent with his prior statements to police and to prosecutors, but the agreement would be rendered null and void if any of the representations contained in [the codefendant's] prior statements, upon which the agreement was predicated, were found to be false." *Bannister*, 378 Ill. App. 3d at 25.

In the absence of case law from this state on this issue, the court in *Bannister* reviewed decisions from other jurisdictions considering the issue. These courts have held that consistency provisions are permissible where they are accompanied by terms that require the witness's testimony to be truthful. *Bannister*, 378 Ill. App. 3d at 31. Agreements requiring preclusion were those in which the prosecution " ' "has bargained for false or specific testimony, or [for] a specific result." ' " *Bannister*, 378 Ill. App. 3d at 31, quoting *State v. Bolden*, 979 S.W.2d 587, 591 (Tenn. 1998), quoting *State v. Burchett*, 224 Neb. 444, 456-57, 399 N.W.2d 258, 266 (1986).

In *State v. Fisher*, 176 Ariz. 69, 859 P.2d 179 (1993), the plea agreement was "further conditioned on an avowal by [Ann Fisher] that if she is *** required to testify, her testimony will not vary substantially in relevant areas to the statements previously given to investigative officers." *Fisher*, 176 Ariz. at 72-73, 859 P.2d at 182-83. The reviewing court found the consistency provision improper because, while there was evidence Mrs. Fisher had made statements inconsistent with those made to Arizona, Iowa and Illinois authorities, her agreement required that her testimony adhere only to the official sanctioned version. *Fisher*, 176 Ariz. at 74, 859 P.2d at 184. The court noted that "[a]greements such as the one involved here undermine the reliability and fairness of the trial and plea bargaining processes and taint the truth-seeking function of the courts by placing undue pressure on wit-

nesses to stick with one version of the facts regardless of its truthfulness." 176 Ariz. at 74, 859 P.2d at 184.

In *State v. Rivera*, 210 Ariz. 188, 109 P.3d 83 (2005), the defendant maintained that the testimony of the accomplice witnesses would have exculpated him if their testimony had not been constrained by their plea agreements with the State. Distinguishing *Fisher*, the court in *Rivera* noted that the agreements in the case before it required the accomplice witnesses to testify fully, accurately, and truthfully. In addition the State did not expressly condition the agreements upon the testimony at trial being consistent with the prior statements. The court found that the agreements were not "consistency agreements" because requiring the witnesses to avow that their prior statements were truthful was not the same as requiring them to testify consistently with a specific version of the facts. Instead, both witnesses acknowledged that the videotaped version of the facts was true and promised to testify truthfully. *Rivera*, 210 Ariz. at 191, 109 P.3d at 86.

The defendant argues that the consistency provision in Aaron's plea agreement rendered his testimony improper because the agreement provided that it would only be revoked if he did not testify to certain facts. He maintains that the agreement in this case differs from the one in *Bannister* because Aaron's agreement did not require him to testify truthfully. The defendant correctly notes that, under the agreement in *Bannister*, if any of the representations in the codefendant's prior statements were found to be false, the agreement would be rendered null and void. As this court pointed out:

"Thus, truthfulness was the overriding requirement of the agreement, and any falsehoods in [the codefendant's] prior statements would nullify the accord. The agreement neither compelled [the codefendant] to disregard his oath of truthfulness nor bound him to a particular script or result. By its terms, the requirement of truthfulness 'necessarily engulfed' the other provisions in the agreement, which was 'hinged upon [the codefendant's] truthful testimony." *Bannister*, 378 Ill. App. 3d at 33, citing *Bolden*, 979 S.W.2d at 592.

Aaron's plea agreement did not contain a similar provision. According to its terms, the plea agreement in this case could only be revoked if Aaron did not testify in accordance with the facts as stated in the agreement. Therefore, unlike the codefendant in *Bannister*, Aaron was bound to testify to certain facts or lose the benefit of his agreement. However, as the court in *People v. Jones*, 236 Mich. App. 396, 600 N.W.2d 652 (1999), observed, while immunity agreements provide some incentive for the witnesses to conform their testimony to their prior accounts of the incident, the defendant's rights are not

violated where the prosecution expressly conditions its grant of immunity on the promises that the witnesses would provide truthful testimony. *Jones*, 236 Mich. App. at 406, 600 N.W.2d at 656-57. According to the terms of the plea agreement in this case, Aaron was offered the benefits of the plea agreement in exchange for his "truthful" testimony, not in exchange for his "consistent" testimony. In addition, in exchange for these benefits, Aaron was required to plead guilty to conspiracy and "swear to the facts contained in the plea agreement." Thus, the condition that Aaron testify truthfully and swear to the facts in the statement "necessarily engulfed" the provision requiring consistent testimony. *Bolden*, 979 S.W.2d at 592.

In addition, courts have allowed the admission of testimony pursuant to a plea agreement requiring consistent testimony where certain safeguards are in place. See *Rivera*, 210 Ariz. at 192, 109 P.3d at 86. In *State v. Nerison*, 136 Wis. 2d 37, 401 N.W.2d 1 (1987), the court stated as follows:

> "When the state grants concessions in exchange for testimony by accomplices or co-conspirators implicating a defendant, the defendant's right to a fair trial is safeguarded by (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the state to testify against the defendant." *Nierson*, 136 Wis. 2d at 46, 401 N.W.2d at 5.

In *United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985), the court recognized that cross-examination had long been the preferred method of ferreting out false testimony from codefendants or other interested persons. The court relied on the Supreme Court's statement in *Hoffa v. United States*, 385 U.S. 293, 17 L. Ed. 2d 374, 87 S. Ct. 408 (1966), that " '[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.' " *Dailey*, 759 F.2d at 196, quoting *Hoffa*, 385 U.S. at 311, 17 L. Ed. 2d at 387, 87 S. Ct. at 418. In the case of an accomplice who has struck a plea agreement, the " 'established safeguards' are that the jury be informed of the exact nature of the agreement, that defense counsel be permitted to cross-examine the accomplice about the agreement, and that the jury be specifically instructed to weigh the accomplice's testimony with care." *Dailey*, 759 F.2d at 196.

■ In this case, the plea agreement was admitted into evidence. While the document was not read to the jury, Aaron testified on direct examination as to the contents of the agreement and that it required him to testify truthfully. Defense counsel thoroughly cross-examined Aaron on the terms of the plea agreement, particularly whether he was required to conform his testimony to the facts stated in the agreement. At all times, Aaron maintained that he was required to testify truthfully. Finally, the jury received the following instruction:

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest or bias, or prejudice he may have, and the reasonableness of his testimony considered in light of all the testimony in the case."

See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000).

The defendant's argument that the State's failure to fully disclose the terms of the plea agreement and failure to send the plea agreement exhibit back to the jury denied him due process, should be rejected. There was no failure on the part of the State to fully disclose the terms of the plea agreement. The agreement was admitted into evidence, and defense counsel was free to make use of it during her cross-examination of Aaron. Defense counsel never requested that the plea agreement exhibit be sent back to the jury.

The defendant contends that the State failed to correct Aaron's "false testimony." The defendant maintains that Aaron misled the jury by testifying that if he did not testify truthfully, the agreement would be void.

Aaron was questioned by the prosecutor as follows:

> "Q. You have an understanding of what will happen with respect to your plea agreement if you do not truthfully testify in this case?
> A. Yes, I do.
> Q. What was your understanding?
> A. That the deal would be void if I don't testify truly to what happened on November 15, 2002."

Aaron did not testify that was what the agreement said; rather, he testified as to what he understood the agreement to mean.

We conclude that the admission of Aaron Cotton's testimony pursuant to a plea agreement did not deny the defendant due process. As no error occurred, the defendant has forfeited the issue.

## II. Felony Murder Instruction

The defendant contends that it was error to give the jury an instruction on felony murder because the offense of aggravated

discharge of a firearm was inherent in the offense of murder in this case.

## A. *Standard of Review*

"Ordinarily, the standard when reviewing the trial court's decision to issue a tendered jury instruction is whether the trial court abused its discretion." *People v. White*, 353 Ill. App. 3d 905, 913, 819 N.E.2d 1239 (2004). The defendant maintains that the issue of whether aggravated discharge of a firearm can serve as the predicate felony for felony murder is an issue of law. Therefore, *de novo* review should apply. See *People v. Pelt*, 207 Ill. 2d 434, 439, 800 N.E.2d 1193 (2003) (question of whether aggravated battery could be a predicate offense for the felony murder presented a question of law).

It is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given. *People v. Mohr*, 228 Ill. 2d 53, 65, 885 N.E.2d 1019 (2008). The court must examine the factual context surrounding the murder in order to determine if the forcible felony can serve as a predicate felony for felony murder. *People v. Toney*, 337 Ill. App. 3d 122, 132, 785 N.E.2d 138 (2003).

Unlike *Pelt*, the question in this case is whether, under the facts, aggravated discharge of a firearm could serve as the predicate felony for felony murder. Therefore, the applicable standard is abuse of discretion.

## B. *Discussion*

### 1. Forfeiture of Issue

The defendant acknowledges that the error was not objected to at trial and was not raised as error in his posttrial motion. He seeks review of the issue under the plain error doctrine. Ordinarily, a defendant forfeits review of an alleged error involving a jury instruction if he does not object to the instruction or offer an alternative instruction and does not raise the issue in a posttrial motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564, 870 N.E.2d 403 (2007). Under Supreme Court Rule 451(c), a defendant does not waive substantial defects in criminal jury instructions by failing to timely object to them where the interests of justice require. *Piatkowski*, 225 Ill. 2d at 564, citing 177 Ill. 2d R. 451(c). Our supreme court has held that Rule 451(c) is coextensive with the plain error clause of Rule 615(a) (134 Ill. 2d R. 615(a)) and that the two rules are construed identically. *Piatkowski*, 225 Ill. 2d at 564. Therefore, the first step in the analysis is to determine if error occurred in the giving of the instruction. *Piatkowski*, 225 Ill. 2d at 565.

## 2. Aggravated Discharge of a Firearm as the Predicate Felony

Our supreme court has held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *People v. Morgan*, 197 Ill. 2d 404, 447, 758 N.E.2d 813 (2001) (it was not the predicate felonies which resulted in the deaths of the victims but rather the murders that gave rise to the predicate felonies). However, the rule in *Morgan* does not prevent a forcible felony from serving as the predicate felony for felony murder when the forcible felony involves conduct not inherent in the act of murder, but conduct with an independent felonious purpose other than the killing itself. *Toney*, 337 Ill. App. 3d at 135.

In *Toney*, members of the Four Corners Hustlers street gang recognized the defendant as he drove down the street with two other members of the Gangster Disciples. During a confrontation between the two gangs, shots were exchanged. A bystander was fatally shot. In determining that the felony murder instruction was proper in that case, the court distinguished *Morgan*. The court in *Toney* determined that the State's evidence demonstrated that the acts constituting the forcible felony of aggravated discharge of a firearm involved conduct with a felonious purpose other than the killing of the bystander. The evidence established that the defendant and his companions intended to commit the independent forcible felony of aggravated discharge of a firearm by shooting at the rival gang members and that the death of the bystander resulted from the use of violence. *Toney*, 337 Ill. App. 3d at 134.

The defendant relies on *People v. Rosenthal*, 387 Ill. App. 3d 858, 900 N.E.2d 1241 (2008).[4] In that case, the victim asked to see the defendant's gun and then fired the gun at the defendant, missing him. Later, while the victim was seated in a car with Tanya Griffin, the defendant walked up to the car and demanded his gun back. The victim shot at the defendant, who pulled out two guns and started shooting at the victim. The victim was hit 10 times, Ms. Griffin once in the arm. The defendant was convicted of felony murder.

This court noted that the State had proceeded to trial only on the count charging felony murder predicated on aggravated battery with a firearm. The only person named in the count was the victim; the count did not mention Ms. Griffin. The court further noted that the

---

[4]Pursuant to a supervisory order, the supreme court ordered this court to vacate its original judgment and consider whether remand for sentencing on aggravated battery with a firearm was appropriate. *Rosenthal*, 387 Ill. App. 3d at 859; see *People v. Rosenthal*, 383 Ill. App. 3d 32, 889 N.E.2d 679 (2008).

State's argument, *i.e.*, that the defendant had a motive to shoot the victim out of revenge, that it amounted to an "execution" and "in cold blood," did not support the theory that the defendant intended to commit an aggravated battery with a firearm against Ms. Griffin. *Rosenthal*, 387 Ill. App. 3d at 863. The court determined that the case was more similar to *Morgan* than *Toney*. The court concluded that an independent felonious purpose for the aggravated battery with a firearm was not charged or proven, especially given the amount of evidence suggesting that the defendant intentionally shot the victim and the instructions and verdict forms submitted to the jury. *Rosenthal*, 387 Ill. App. 3d at 864.[5]

The present case is more akin to *Toney* than *Morgan* or *Rosenthal*. The evidence established that the defendant began firing a gun at the Diggs van, in which Mr. Thigpen and several other persons were riding as passengers. The defendant argues that there was no evidence that he knew that the van contained other individuals. However, unlike *Rosenthal*, there was no evidence that the defendant fired at the van to kill Mr. Thigpen. The evidence established that the defendant simply opened fire on the Diggs van and, as a result, Mr. Thigpen was shot. As in *Toney*, the defendant's felonious conduct had a purpose other than the killing of Mr. Thigpen.

In *People v. Davis*, 213 Ill. 2d 459, 821 N.E.2d 1154 (2004), the supreme court held that mob action was a proper predicate felony for felony murder. In order to convict the defendant of mob action, it was not necessary to prove the defendant struck the victim or performed the act which caused his death. *Davis*, 213 Ill. 2d at 474. Likewise, in the present case, the defendant was convicted of aggravated discharge of a firearm in that he discharged a firearm in the direction of a vehicle he knew to be occupied. Given that Mr. Diggs was the driver and therefore occupied the vehicle, it was not necessary for the shot fired by the defendant to have struck and killed Mr. Thigpen in order for the defendant to be convicted of aggravated discharge of a firearm.

Relying on several cases from our United States Supreme Court, the defendant argues that convicting him of an uncharged offense, felony murder, violates due process. He further argues that when one

---

[5]Having reversed the felony murder conviction, this court determined remand for sentencing on the lesser-included offense of aggravated battery with a firearm was improper. *Rosenthal*, 387 Ill. App. 3d at 867. On May 29, 2009, our supreme court issued a supervisory order directing this court to vacate that portion of its opinion dealing with double jeopardy and ordering this court to address the other issues raised and to remand for sentencing on the offense of aggravated battery with a firearm.

of the theories the trial court submits to the jury is found unconstitutional, the error is not cured by a general verdict. The defendant notes that this same issue is presently on review before the Illinois Supreme Court in *People v. Davis*, 231 Ill. 2d 349, 899 N.E.2d 238 (2008) (court remanded for a *Batson* hearing and agreed to address the remaining issues upon resolution of the *Batson* issue).

On May 21, 2009, the supreme court issued its opinion in *Davis*. *People v. Davis*, 233 Ill. 2d 244, 909 N.E.2d 766 (2009). The court rejected the same constitutional arguments raised by the defendant in this case. After a thorough analysis, the court concluded that the giving of a felony murder instruction, even if erroneous, was a typical trial error that did not amount to a structural defect that required automatic reversal. *Davis*, 233 Ill. 2d at 273.

■ Even assuming the application of the one-good-count presumption was faulty, because the defendant did not object at trial to the instruction or raise it in his posttrial motion, the court held that plain-error analysis was appropriate. *Davis*, 233 Ill. 2d at 273-74. The defendant must show that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *Davis*, 233 Ill. 2d at 274.

The defendant maintains that the evidence is closely balanced because the State's witnesses were impeached and the defendant presented an alibi. The defendant relies on *People v. Keefe*, 209 Ill. App. 3d 744, 567 N.E.2d 1052 (1991). There the reviewing court found the evidence closely balanced where the State and the defendant presented conflicting stories of the altercation. The defendant also points out that the jury sent a note to the trial court indicating that it was deadlocked at eight to four. See *People v. McLaurin*, 382 Ill. App. 3d 644, 894 N.E.2d 138 (2008), *appeal allowed*, 229 Ill. 2d 646, 897 N.E.2d 260 (2009) (jury deadlock at seven to five indicated that State failed to present overwhelming evidence of the defendant's guilt and was a further indication that the evidence was closely balanced).

In this case, the defendant was identified as the shooter by five eyewitnesses, including the codefendant, Aaron Cotton. Their ability to view the defendant at the time of the shooting was not in question. While Ms. Page, Ms. Johnson and Mr. Clark did not immediately tell the police that the defendant was the shooter, they explained that it was because they were upset and concerned about their friend, Mr. Thigpen. The police officers who testified confirmed how upset Ms. Page and Ms. Johnson were. While Mr. Hicks and Mr. Fields acknowledged the inconsistencies in their statements to police, they also provided reasonable explanations for those inconsistencies.

On the other hand, the testimony of Mrs. Williams was impeached by her prior written statement. Mr. Louis's testimony did not provide an alibi for the defendant since he testified that he did not know what the defendant was doing at 2:15 p.m., the time of the incident. Mr. Louis could only testify in support of Mrs. Williams's testimony, which had been impeached by her prior written statement. In light of the strength of the State's eyewitness testimony and given her relationship to the defendant, Francesca Williams's testimony that the defendant never left the house until 6 p.m. that night does not render the evidence closely balanced. Moreover, the mere fact that the jury indicated in one note that it could not reach a decision does not render the evidence closely balanced. *People v. Vasquez*, 368 Ill. App. 3d 241, 252, 856 N.E.2d 523 (2006).

We conclude that the trial court did not err in instructing the jury on felony murder. Even assuming *arguendo* it was error, under the plain error analysis, the evidence in this case was not closely balanced. Therefore, any error in instructing the jury on felony murder was harmless. See *Davis*, 233 Ill. 2d at 274-75.

## III. Jury Note

The defendant contends that his constitutional rights were violated when he was denied his right to be present when the trial judge responded to a note from the jury.

At 6:50 p.m., the jury sent a note to the trial judge requesting the stipulations read at the end of the trial and transcripts of the defendant's and Ms. Page's testimony. The record reflected that both sides were present and agreed on responding to the jurors that they should rely on their collective memories and continue to deliberate.

At 9 p.m., the trial judge received a second note from the jury stating that they were "divided 8 to 4 and doesn't look like anyone will change." The trial judge noted that defense counsels had not returned and stated:

> "I will give them the note. 'Please continue your deliberations. Thank you, Judge Cannon.' We will put this back on the record if the defense has any input or would like Prim or anything else, I will entertain that then."

When one of the defense counsel arrived, the trial judge informed her of the jury's note and that it had told the jury to continue to deliberate. Defense counsel responded, " 'Okay.' "

At 10:30 p.m., the trial judge informed the jurors that they should return the next morning to continue deliberations. However, by then, the jury had reached a verdict in this case.

## A. *Standard of Review*

"The standard of review for determining whether an individual's constitutional rights have been violated is *de novo.*" *Burns*, 209 Ill. 2d at 560, but see *Campos*, 349 Ill. App. 3d at 174-75 (noting that the supreme court applied an abuse of discretion standard to review a trial court's decision to disqualify a defendant's chosen counsel).

## B. *Discussion*

### 1. Forfeiture of Issue

The defendant did not raise an objection to the trial judge's action in responding to the jury's note in his absence. The alleged error was not raised in the defendant's posttrial motion. Therefore, the issue is forfeited. *Medina*, 221 Ill. 2d at 402.

The defendant responds that because the alleged error involved the conduct of the trial judge, it is not subject to the same rules of waiver. In *People v. Kliner*, 185 Ill. 2d 81, 705 N.E.2d 850 (1998), despite the failure of the defendant to preserve the alleged error, our supreme court chose to review an issue involving a communication between the trial judge and the jury outside the presence of the defendant. The court noted that "application of the waiver rule is less rigid where the basis for the objection is the trial [court's] conduct." *Kliner*, 185 Ill. 2d at 161.

More recently, however, our supreme court has indicated that the waiver applied to the issue of an *ex parte* communication between a trial judge and the jury. In *People v. Johnson*, 383 Ill. App. 3d 281, 890 N.E.2d 668 (2008), the *ex parte* communication issue was not preserved for review. The reviewing court disagreed that plain-error review applied, but concluded that, even if it did, the defendant had established prejudice. *Johnson*, 383 Ill. App. 3d at 284. The supreme court issued a supervisory order directing the court in *Johnson* to vacate its opinion and to reconsider its judgment "in light of the rule that in a plain error analysis, the burden of persuasion is on the defendant." *Johnson*, 229 Ill. 2d 681, 896 N.E.2d 1060 (2008).

Therefore, as the defendant has forfeited the alleged error, review is limited to plain error. As previously stated, the first step is to determine if error occurred. *Hudson*, 228 Ill. 2d at 191.

### 2. Right to Be Present for Jury Note

Under both the federal and our state constitutions as well as by statute, a criminal defendant has the right to appear and participate in person and by counsel at all proceedings which involve his substantive rights. *People v. Childs*, 159 Ill. 2d 217, 227, 636 N.E.2d 534 (1994); U.S. Const. amend VI; Ill. Const. 1970, art. I, §8; Ill. Rev. Stat.

1987, ch. 38, par. 115—4. "A communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in defendant's presence, deprives defendant of those fundamental rights." *Childs*, 159 Ill. 2d at 227. The record here established that the defendant was deprived of his constitutional right to be present when the trial judge responded to the jury's note in his absence. However, a reviewing court will not set aside a jury verdict where it is apparent that no injury or prejudice resulted from an *ex parte* communication. *Childs*, 159 Ill. 2d at 227-28. The issue therefore is whether the defendant suffered any injury or prejudice as the result of the improper communication. *People v. McDonald*, 168 Ill. 2d 420, 460, 660 N.E.2d 832 (1995).

Where the defendant has preserved the issue for appeal, it is the State's burden to prove beyond a reasonable doubt that the error was harmless. *Childs*, 159 Ill. 2d at 228. However, in this case, where the error was not preserved, the burden is on the defendant. See *People v. Johnson*, 388 Ill. App. 3d 199, 902 N.E.2d 1265 (2009), *appeal allowed*, 232 Ill. 2d 588 (2009).[6]

In *Johnson*, after the jury returned its guilty verdict, the trial court informed the parties that it had received a note from the jury, while it was still deliberating, stating the vote stood at 11 to 1 and that the jurors needed help or advice. The trial judge had responded that the jurors should keep deliberating. Upon being informed of the note and the trial judge's response, neither side raised any objections.

The Third District Appellate Court held that the defendant had carried his burden of proof that the trial court's *ex parte* communication with the jury prejudiced him, stating as follows:

"Johnson's absence at this critical stage in the proceedings denied him direct knowledge of what was said and done in response to the jury's question and deprived him of the opportunity to make objections and take any actions necessary to secure his rights. The State speculates that the trial court would have refused a request by Johnson for a *Prim* instruction because of the short duration the jury had deliberated before sending its note and because the trial court failed to give the instruction at Johnson's first trial. *** The State's speculation is unpersuasive. Johnson was deprived of his right to be present when the jury note was presented and we can-

[6]This is the court's opinion after remand pursuant to the supreme court's supervisory order (*People v. Johnson*, 229 Ill. 2d 681, 896 N.E.2d 1060 (2008)). In his brief, the defendant relied on the original opinion in *Johnson* (*People v. Johnson*, 383 Ill. App. 3d 281, 890 N.E.2d 668 (2008)). The court reached the same result in both opinions.

not guess what response he may have had to it." *Johnson*, 388 Ill. App. 3d at 203-04.

In addition to the original opinion in *Johnson*, the defendant also relies on *McLaurin*. In that case, the jury sent five notes to the trial judge, which were discussed with the attorneys for both sides but not the defendant. In response to one of the notes, the trial judge instructed his sheriff to tell the jury to keep deliberating. As in the present case, the alleged errors were not preserved for review.

This court undertook a plain error analysis and found error occurred where the defendant was excluded from the discussion of the jury's notes to the trial court and when the sheriff's deputy had the *ex parte* communication with the jury. The court then determined that the evidence was closely balanced given the conflicts in the testimony and the fact that the jurors' note stated they were deadlocked at "'7-5'" indicated that the State had not presented overwhelming evidence of the defendant's guilt. *McLaurin*, 382 Ill. App. 3d at 652. The court went on to find that the errors were so serious that they affected the fairness of his trial. Thus, both prongs of the plain error rule were implicated. *McLaurin*, 382 Ill. App. 3d at 656.

The court rejected the State's argument that the errors were harmless beyond a reasonable doubt. The court found that the defendant's exclusion from the discussion of the jury's notes deprived him of the opportunity to participate in his defense and because after the sheriff's communication with the hung jury, the defendant was convicted and sentenced to prison. As in *Johnson*, the court refused to speculate as to the effect of the sheriff's communication on the jurors due to the constitutional violation and the fact that the evidence was closely balanced. The court concluded that the State had failed to show that the errors were harmless beyond a reasonable doubt. *McLaurin*, 382 Ill. App. 3d at 656.

In *People v. Phillips*, 383 Ill. App. 3d 521, 890 N.E.2d 1058 (2008), *appeal denied*, 233 Ill. 2d 587 (2009), another division of this court distinguished *McLaurin*. In *Phillips*, defense counsel waived the defendant's presence at a conference discussing the appropriate response to a jury question. The court declined to apply the waiver rule because the issue involved the trial court's conduct. *Phillips*, 383 Ill. App. 3d at 548. The court determined that error occurred but found it to be harmless beyond a reasonable doubt. The court noted that in *McLaurin*, the defendant had been excluded from discussions involving multiple jury notes, whereas in the case before it, there was one meeting in open court discussing a single question from the jury and that the trial judge responded as requested by defense counsel. Unlike *McLaurin*, where the proceedings were not on the record, in

*Phillips*, the proceedings were conducted on the record and the reviewing court was able to conclude that the communication did not prejudice the defendant. *Phillips*, 383 Ill. App. 3d at 552.

■ As was the case in *Phillips*, the proceedings here were conducted on the record and involved a single question by the jury. When given the opportunity to respond to the jury's note, defense counsel did not suggest an alternative response and agreed with the trial court's response to the jury. Therefore, this court does not have to speculate as to what the response would have been had defense counsel and the defendant been present at the time the jury posed the question. Moreover, unlike *Johnson*, defense counsel was given the opportunity to respond to the jury's question while the jury was still deliberating.

Finally, the result in *McLaurin* is questionable. The opinion places the burden of persuasion on the State, which in light of the supervisory order in *Johnson*, would appear to be error. In addition, the court in *McLaurin* appears to assume that the defendant was prejudiced by his failure to be present without determining how he was actually prejudiced. Likewise the court's refusal to speculate as to the harm to the defendant as a result of the deputy's *ex parte* communication with the jury also merely "assumes" there must be prejudice. Finally, as the supreme court has granted review in *McLaurin*, any reliance on it as persuasive authority is questionable.

The defendant's argument is based solely on the fact he was not present at the time the trial court addressed the jury's remark. He makes no other effort to establish how his failure to participate in formulating a response to the jury's question prejudiced him. In other words, he is asking this court to "speculate" that he would have responded differently to the jury's note, despite the fact that his counsel indicated agreement with the trial judge's response. Therefore, the defendant has failed to carry his burden of establishing that he was prejudiced by the error.

We conclude that, while the trial court erred in responding to the jury's question in the absence of the defendant, the defendant has failed to establish that he was prejudiced by the error.

## IV. Sentencing

The defendant contends that, in imposing the sentence in this case, the trial court relied on an improper factor and that the sentence imposed was excessive.

### A. *Standard of Review*

This court reviews a claim of error under the abuse of discretion standard. *People v. Johnson*, 347 Ill. App. 3d 570, 573-74, 807 N.E.2d

1171 (2004). "Consideration of an improper factor in aggravation affects a defendant's fundamental right to liberty, and therefore, is an abuse of discretion." *People v. McAfee*, 332 Ill. App. 3d 1091, 1096, 744 N.E.2d 469 (2002). A trial court abuses its discretion only if its ruling is arbitrary, unreasonable or where no reasonable person would take the view adopted by the trial court. *Johnson*, 347 Ill. App. 3d at 574.

## B. *Discussion*

■ The defendant did not raise the alleged sentencing errors in his motion for reconsideration of sentence. Because a defendant has a right to be lawfully sentenced, the court should review the error under the plain error doctrine. *Johnson*, 347 Ill. App. 3d at 574. As noted earlier, there must first be a determination of whether error was committed. *Hudson*, 228 Ill. 2d at 191.

### 1. Trial Court's Incorrect Recall of the Trial Evidence

The defendant maintains that he was sentenced based on the trial court's misapprehension that the defendant was aware that the black van contained multiple passengers. Just prior to imposing the sentences in this case, the trial court stated in pertinent part as follows:

> "We have lives that were forever changed on both sides. Your brother, Aaron Cotton, along with the witnesses in this case testified before the jury. This court heard their testimony. And I will state that I do believe that Aaron Cotton's life is forever changed because of the fact he was present on that day, sir. He is doing twelve years in the Illinois Department of Corrections because he had the misfortune of driving a car that you hung out of and fired into a van. A van full of people.
>
> Those people, there is no evidence they exhibited any ill will toward you. There is no evidence that they provoked anything from you. One of the witnesses actually gave you a wave, thinking you were someone else. When he realized it wasn't the person he thought it was, he still thought all was well when he got back into that van, that van that was shot at over, and over and over again by you, sir. In broad daylight. With people having nowhere to go, people sitting there in their own little coffin as you fired and fired and fired into that, not caring how many you killed, how many you maimed.
>
> I do believe based on the testimony of the witnesses that it was nothing short of a miracle that only one person was killed by your actions."

The State responds that the trial court's comment was a reasonable inference from the record.

There is no direct evidence that the defendant knew the Diggs van contained multiple passengers. Moreover, the trial court was incorrect when it referred to Mr. Clark as waving at the defendant rather than Aaron as the trial testimony established.

Nonetheless, even reliance on an improper factor in aggravation does not necessarily require remand where the weight of the factor is so insignificant that it did not lead to a greater sentence. *People v. Thurmond*, 317 Ill. App. 3d 1133, 1143, 741 N.E.2d 291 (2000). In considering whether a mistaken belief influenced the trial court's sentencing decision, the reviewing court looks to whether the trial court's comments show that the court relied on the mistaken belief or used the mistaken belief as a reference point in fashioning the sentence. *People v. Hill*, 294 Ill. App. 3d 962, 970, 691 N.E.2d 797 (1998).

Taken as a whole, we are satisfied that the defendant's sentence was not the product of the trial court's failure to recall the trial evidence correctly. Rather, the sentence reflected the trial court's consideration of the defendant's mitigation testimony, his criminal history and his failure to avail himself of the rehabilitation opportunities previously afforded him. The court also considered how the defendant's actions adversely affected his own brother. The court's remarks about the other occupants of the Diggs van came just prior to the imposition of the sentences in this case. Considering the sentencing hearing as a whole, we are satisfied that the trial court's failure to recall the evidence correctly did not result in a greater sentence than would otherwise have been imposed. See *People v. McGee*, 287 Ill. App. 3d 1049, 1054, 679 N.E.2d 796 (1997) (sentencing judge's consideration of the threat of harm beyond that implicit in the statute did not amount to plain error as it did not result in a greater sentence).

## 2. Excessive Sentences

A reviewing court will not disturb a sentence within the statutory guidelines unless it is greatly disproportionate to the nature of the offense. *Johnson*, 347 Ill. App. 3d at 574. The nonextended-term sentence sentencing range for the offense of first degree murder is 20 to 60 years. See 730 ILCS 5/5—8—1(a)(1)(a) (West 2002). The trial court was also required to add an additional term of imprisonment, ranging from 25 years to natural life, to the defendant's sentence for murder because the jury found that the defendant had personally discharged a firearm which resulted in death to another person. See 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002). In this case, the trial court imposed the minimum additional term of imprisonment of 25 years. Therefore the defendant's sentence of 60 years, *i.e.*, 35 years for

the murder plus 25 years under section 5—8—1(a)(1)(d)(iii) was within the statutory guidelines.

The defendant was also convicted of aggravated discharge of a firearm which is a Class 1 felony. See 720 ILCS 5/24—1.2(a)(2) (West 2002). The applicable sentencing range for a Class 1 felony was 4 to 15 years' imprisonment. See 730 ILCS 5/5—8—1(a)(4) (West 2002). Therefore, the defendant's sentence of 10 years was also within the statutory guidelines.

The defendant contends that his sentences are excessive in that they do not reflect his potential for rehabilitation. He argues that the trial court failed to consider the testimony of his witnesses that he had rehabilitation potential and failed to consider his steady employment history and that his prior criminal history was only for drug-related offenses.

There is a presumption that when a court hears evidence in mitigation the court considered that evidence. *People v. Phillips*, 265 Ill. App. 3d 438, 450, 637 N.E.2d 715 (1994). In this case, the trial court's remarks confirm that it considered the factors in mitigation, even if it did not specifically mention the defendant's work history. As to his rehabilitation potential, " 'a trial court is not required to give rehabilitative potential more weight than it gives the seriousness of an offense.' " *Phillips*, 265 Ill. App. 3d at 450, quoting *People v. Tatum*, 181 Ill. App. 3d 821, 826, 537 N.E.2d 875 (1989). "The prime responsibility for determining the proper balance between the two factors lies with the trial court." *Phillips*, 265 Ill. App. 3d at 450.

The evidence established that, without provocation, the defendant fired multiple shots at the Diggs van. The defendant's random act of violence killed one person and, as noted by the trial court, forever changed the life of his brother and codefendant, Aaron, by involving him in the crime. As for the defendant's rehabilitation potential, the trial court noted that the defendant had been given probation and thereafter had committed more drug-related offenses. The defendant did not receive the maximum sentence for either offense. For each offense, the defendant received a mid-range sentence and was given the minimum "add-on" sentence for using a firearm to commit the murder.

We conclude that the sentences imposed in this case properly balanced the seriousness of the offenses with the defendant's potential for rehabilitation. Therefore, the trial court did not abuse its discretion in imposing the sentences in this case.

## V. Correction of the Mittimus

■ The defendant contends, and the State agrees, that the mittimus should be corrected to reflect that the defendant is entitled to

an additional 22 days credit toward his sentence. Therefore, we direct the circuit court to correct the mittimus to reflect 1,397 days sentencing credit. See *People v. McCray*, 273 Ill. App. 3d 396, 653 N.E.2d 25 (1995) (remand not required for correction of the mittimus).

## CONCLUSION

The defendant's convictions and sentences are affirmed.

Affirmed.

R.E. GORDON, P.J., and GARCIA, J., concur.