NOTICE

Decision filed 03/31/21, corrected 06/14/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180058-U

NO. 5-18-0058

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Fayette County. |
| | ) | |
| v. | ) | No. 10-CF-130 |
| | ) | |
| CLIFFORD W. BAKER, | ) | Honorable |
| | ) | Allan F. Lolie, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*: The sentencing court did not abuse its discretion when the court found the defendant was permanently incorrigible after considering the defendant's youth and its attendant characteristics pursuant to 730 ILCS 5/5-4.5-105(a) (West 2018). Moreover, the record does not show that deterrence of others weighed heavily on the court's sentencing decision, and the court did not err in finding the defendant's criminal activity as a factor in aggravation. Finally, the court's alleged mistake of fact did not result in a greater sentence than would have otherwise been imposed.

¶ 2   Following a jury trial, the defendant, Clifford W. Baker, was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) for the shooting deaths of John Michael "Mike" Mahon and Debra H. Tish; two counts of home invasion (720 ILCS 5/12-11(a)(5) (West 2010)) for entering the Mahon-Tish home without authority and

1

causing injury to Mahon and Tish, separately; and a third count of home invasion (720 ILCS 5/12-11(a)(2) (West 2010)) for entering the home of Steve and Randy Krajefska without authority and causing injury to Randy Krajefska. At the time of the offenses, the defendant was 15 years old. He was sentenced to mandatory terms of natural life imprisonment for the murder convictions, pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2010)). The defendant also received a term of 30 years for each of the three home invasion charges, with one of the 30-year terms to run consecutive to all other sentences imposed.

¶ 3    In his direct appeal, this court vacated the defendant's mandatory natural life sentences for the murder charges and remanded his case for a new sentencing hearing in accordance with *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Baker*, 2015 IL App (5th) 110492, ¶ 83. We also directed the trial court to determine which of the two Mahon-Tish home invasion convictions constituted a less serious offense, vacate that conviction, and correct the sentencing order. *Baker*, 2015 IL App (5th) 110492, ¶ 83. We affirmed the defendant's convictions in all other respects. *Baker*, 2015 IL App (5th) 110492, ¶ 83.

¶ 4    On remand, the defendant was resentenced to an aggregate prison term of 85 years, of which the defendant will be required to serve 80 years. The defendant now appeals this sentence. For the following reasons, we affirm.

¶ 5                    I. BACKGROUND

¶ 6    Detailed facts concerning the events that transpired and the evidence presented at the defendant's trial were set forth in our prior opinion. See *People v. Baker*, 2015 IL App (5th) 110492. We will, however, provide a summary of the offenses, as needed for context.

¶ 7                    A. The Defendant's Offenses

¶ 8    On August 4, 2010, at approximately 3:30 a.m., Steve Krajefska and his wife, Randy, were awakened when a person walked through their bedroom and into a closet. Randy turned on her bedside light and approached the closet. When she was near the closet, a person jumped up, punched her in the jaw, and cut her above the eyebrow with a knife. Randy ran into the bathroom. Steve was standing on the opposite side of the bed and recognized the intruder as the defendant. The defendant was barefoot, wearing only shorts, and hunched over, as if in "attack mode." He was also holding a butcher knife. Steve ordered the defendant to drop the knife. The defendant lunged toward Steve and swiped at him with the knife but missed. The defendant then exited the bedroom and ran from the house. Steve immediately called 911. While Steve was on the phone with the operator, Randy noticed the lights were on in the Mahon-Tish home. Randy called their house, but no one answered.

¶ 9    Two Fayette County sheriffs' deputies, Steven Coody and Josh Wattles, were dispatched to investigate the reported home invasion at the home of Steve and Randy Krajefska, in Loogootee, Illinois. The deputies were just outside Loogootee when they were notified that the defendant had left the Krajefska residence and was last seen walking

3

toward his home. The deputies drove directly to the defendant's house where they arrested the defendant.

¶ 10 After taking the defendant into custody, Steve directed Deputy Coody to the Mahon-Tish residence because Steve was concerned. Deputy Coody walked around the Mahon-Tish residence. The back door was open, and the lights were on inside. Deputy Coody knocked and announced his presence. When no one responded, he entered the house and observed two rifles lying on a table in the kitchen. He then entered the living room where he observed two people, partially covered with a sheet, lying on a mattress. Deputy Coody discovered both individuals had severe head wounds. It appeared that they had been shot multiple times and died as a result of their wounds. Deputy Coody searched the rest of the residence but found no one else inside. The deceased victims were later identified as Mike Mahon and Debra Tish. In a subsequent interview with investigators, the defendant admitted to shooting Mahon and Tish.

¶ 11 B. The Defendant's Original Sentencing Proceedings

¶ 12 1. The Presentence Investigation Report

¶ 13 Prior to the defendant's first sentencing hearing, a presentence investigation report (PSI) was prepared. Attached to the PSI was a Fayette County sheriff's report from August 4, 2010, concerning the defendant's charges and a "Detention Court Report" prepared by assistant superintendent Dave Townzen with the Madison County Probation Department.

¶ 14 The PSI detailed the defendant's family and home environment. Throughout his life, the defendant moved on several occasions and, at various times, lived with his grandmother, father, and an uncle. When asked about his relationship with his father, the

4

defendant reported that they got along, except when his father, Jeff Goldman, would drink alcohol. The defendant recalled that Jeff drank throughout the defendant's life. When Jeff would discipline the defendant, Jeff would yell and make the defendant work around the house. If the defendant would cuss, Jeff would "smack" the defendant in the mouth. The defendant claimed that in 2004, Jeff witnessed a murder and "was never the same." The defendant stated that Jeff became paranoid and would not allow the defendant to go anywhere. When the defendant was younger, his uncle, Robert Goldman, would take the defendant fishing to get him out of the house. The defendant also reported that his father had a girlfriend, Justina Fryman. The defendant claimed he had a good relationship with Justina and her son, but not Justina's daughter. When the defendant and Jeff moved in with Justina, Jeff yelled at the defendant less.

¶ 15 The PSI also contained information regarding Jeff's criminal history, which included cases for domestic battery in 1998, driving under the influence in 2000, aggravated assault in 2003, and another domestic battery in 2005. The defendant's paternal grandmother was the victim of the 1998 domestic battery and the 2003 aggravated assault. The 2005 domestic battery was committed against the defendant.

¶ 16 Concerning the defendant's relationship with his mother, Tequila Baker, the defendant reported that she left him when he was three years old. After she left, the defendant only saw his mother once. When he was 11 years old, the defendant found Tequila online and reached out to her. She subsequently visited the defendant for a couple of hours. Following the defendant's arrest, Tequila visited the defendant in juvenile detention and the two had sporadic contact thereafter.

¶ 17    The PSI also set forth the defendant's schooling and behavior before his arrest and while in juvenile detention. The defendant reported that he began getting into trouble, usually for fighting, following his grandmother's death when the defendant was around 11 years old. In the seventh grade, after getting into a fight, the defendant was transferred to "Safe School." In the eighth grade, the defendant moved to a new city but was again transferred to "Safe School" prior to the end of the year. The PSI reported that a psychological evaluation completed in April 2009 indicated the defendant was placed in a self-contained classroom due to significant behavior problems and academic deficits. The defendant's placement in the self-contained classroom was required after the defendant was involved in a fight. The evaluation further indicated that getting along with peers was an ongoing problem for the defendant.

¶ 18    The defendant's grades revealed that he received "A's and B's" until the third grade when he received "C's and D's." He then failed fourth grade and was required to attend summer school. During that year, the defendant began receiving special education resources. In fifth grade, he, again, received failing grades. At "Safe School," the defendant stated that his grades "started out okay," but he began to receive failing grades because he would not complete his work and occasionally skipped school.

¶ 19    When the defendant arrived at the Madison County Juvenile Detention center, he was initially placed on high-risk suicide watch but was downgraded to medium risk several months later. He remained at medium risk throughout his stay there. At one point, for approximately four months, the defendant was labeled an escape risk due to comments he made about whether a transportation officer could catch the defendant if he ran. During his

6

time in the detention center, the defendant received four reprimands for cursing at peers, being in possession of "a rope made out of toilet paper," pocketing his medication, and possessing another resident's contact information, which was considered "non-harmful contraband." The "Detention Court Report" stated the defendant "demonstrated the ability to function appropriately within the highly structured environment of the Detention Center." The report also noted that the defendant embraced educational and therapeutic programs and excelled in regard to behavior management. The report averred that aside from the defendant's reprimands, he was a model resident. In juvenile detention, the defendant received A and B grades in the educational portion of the center, and defendant expressed an interest in obtaining further education.

¶ 20 The defendant's mental health history included the defendant's admission to Gateway Regional Medical Center, a short-term psychiatric facility, on July 23, 2010, and subsequent diagnosis for major depressive disorder. The PSI reported that Gateway's records indicated the defendant's treatment plan and recommendations included: admitting the defendant and evaluating his medical regimen; participation in individual and group therapy, working on anger control and interpersonal issues; and involving the defendant's father in parenting issues and family therapy. The defendant was discharged from Gateway on July 30, 2010, and his prognosis was "fair." The defendant was prescribed Cymbalta and was to follow up with psychiatric and psychotherapeutic providers closer to his home. The defendant went to the local community resource center one time following his discharge from Gateway. At the time of the PSI, the defendant was prescribed trazodone

7

to help him sleep, but he was not taking any antidepressant medication. The defendant alleged that he coped with stress and anxiety by "blocking it out."

¶ 21     The defendant's substance abuse history revealed that the defendant began using marijuana and drinking alcohol when he was approximately 11 to 12 years old. He would "get high" to manage his stress and anxiety and drink alcohol because he had trouble sleeping after his grandmother passed away. The amount of alcohol the defendant consumed depended on the amount his father kept in the refrigerator, because the defendant did not want to get caught taking his father's alcohol. By the age of 14, the defendant would drink with friends to the point of intoxication. When the defendant was 15 years old, he tried cocaine. He also started abusing prescription medications, such as Xanax and Vicodin, when the medications were made available by his friends.

¶ 22                    2. The Sentencing Hearing

¶ 23     At the first sentencing hearing, the State did not present evidence in aggravation but requested that the trial court take judicial notice of the court file and the evidence adduced at trial. The defendant, on the other hand, called several witnesses to testify in mitigation.

¶ 24     One of the defendant's former principals testified that the defendant had to repeat the fifth grade and was involved in a fight at school. Two of his former teachers also testified that the defendant was well behaved in class but had problems during "unstructured time" and in "unstructured areas."

¶ 25     The defendant also called several members of his family to testify. Jeff Goldman admitted he had a drinking problem that impacted his ability to take care of the defendant. While the defendant's mother was not involved in the defendant's life, Jeff's mother helped

8

raise the defendant until she passed away. Jeff testified that he was hard on the defendant and kept him "on a short leash." Jeff was concerned that the defendant would end up like Jeff.

¶ 26    Justina Fryman testified that the defendant was a "good kid" who did not fight with her two kids or bully other children. Justina stated that the defendant was involved in a fight once, but she never viewed him act as a violent person. While Justina never caught the defendant drinking alcohol, she did confront him about smoking marijuana once. Justina also witnessed that Jeff's alcohol consumption led to problems with the defendant, indicating that Jeff "would get aggravated" and "scream."

¶ 27    The defendant's uncle Robert testified that he tried to be involved in the defendant's life and helped raise him until Robert had his own son. Robert considered himself more a father to the defendant than Jeff, whom Robert did not consider a good father. Robert stated that the Jeff would administer corporal punishment and was verbally abusive to the defendant. Robert claimed that he never saw the defendant be mean, abusive, or violent toward any person. The defendant did, however, tell Robert that the defendant did not like his prescription medication, Cymbalta. The defendant alleged that the pills gave him nightmares.[1] Robert did not tell anyone about the defendant's nightmares because Robert was concerned about a confrontation with Jeff.

¶ 28    Jeff's cousin, Nelda Seibert, testified that she would babysit the defendant and offered him emotional support. Seibert noted that the defendant had difficulties with Jeff,

---

[1] At trial, Robert testified that the defendant told Robert the Cymbalta medication caused the defendant to have nightmares where he was dreaming about being killed and killing people.

and if something was wrong, the defendant would call Seibert, who would offer the defendant reassurances. Seibert asserted that she never observed the defendant as violent.

¶ 29 Finally, Tequila Baker testified that she lost custody of the defendant to Jeff about a year after the defendant was born. She alleged that Jeff drank a lot and was abusive to her in their relationship. After losing custody, Tequila moved to Indiana and could not visit the defendant because she did not have a driver's license. She claimed that when she tried to see the defendant, Jeff would not allow it. Tequila eventually lost contact with the defendant until he reached out to her on the Internet. Tequila testified that she subsequently met the defendant when he was 13, but she went to prison shortly thereafter. She stated that they stayed in contact and wrote to each other for a while, but the defendant eventually stopped writing her. Occasionally, the defendant called Tequila or talked to her on Facebook, but the communications were not consistent.

¶ 30 After the defendant's evidence in mitigation, the State presented several victim impact statements to the court. The defendant also made a statement in allocution in which he apologized for his offenses and stated that he took accountability for his actions. The parties then presented arguments as to what they believed would be an appropriate sentence. In their arguments, the parties disagreed as to whether the trial court had discretion, pursuant to *People v. Miller*, 202 Ill. 2d 328 (2002)[2] (*Leon Miller*), to sentence

---

[2]In *People v. Miller*, a 15-year-old defendant was convicted of two counts of first degree murder based upon a theory of accountability. 202 Ill. 2d 328, 330 (2002). The trial court sentenced the defendant to 50 years' imprisonment rather than the statutorily mandated sentence of natural life in prison (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)). *Miller*, 202 Ill. 2d at 330. The trial court declined to impose the statutorily mandated sentence, holding that it violated the Illinois proportionate penalties clause (Ill. Const. 1970, art. 1, § 11) and the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). *Miller*, 202 Ill. 2d at 330. The State appealed directly to the Illinois Supreme Court, which affirmed the defendant's

the defendant to anything other than natural life in prison. The defendant requested a sentence that would allow him to be released when he reaches "full Social Security age." The trial court found that, even in light of *Leon Miller*, the court had no discretion to impose any sentence other than natural life and sentenced the defendant accordingly for the two counts of first degree murder. The defendant was also sentenced to 30 years for each of the three home invasion convictions. All sentences were ordered to run concurrent except for one of the home invasion sentences, which was ordered to run consecutively to all other sentences.

¶ 31                    C. The Defendant's Resentencing Proceedings

¶ 32                            1. Updates to the PSI

¶ 33    After this court remanded the defendant's case for a resentencing hearing, a new judge (sentencing court) was assigned to the defendant's case. The PSI was twice updated prior to the defendant's new sentencing hearing.

¶ 34    The updates to the PSI indicated that the defendant had completed a substance abuse program while incarcerated. The defendant reported that he was doing better with his mental health and was not taking any medications at the time. He also completed several classes, including a United States and State of Illinois constitution examination, graduated as the valedictorian of his high school class, and was on the honor roll at the Illinois Youth Center in Kewanee. In hopes of attaining a paralegal degree, the defendant applied to Blackstone Institute and planned to do coursework through the mail. At the time the PSI

---

sentence, holding that section 5-8-1(a)(1)(c)(ii) violated the proportionate penalties clause as applied to the defendant. *Miller*, 202 Ill. 2d at 330.

was updated, the defendant was still awaiting an admission decision from Blackstone. When the defendant was transferred to the Illinois Department of Corrections (IDOC), he obtained a job in the kitchen. He lost this job in May 2015, for "intimidating and threatening staff." The defendant alleged that he asked a staff member a question, and the staff member "took it the wrong way." He regained this job in November 2016 and worked five hours every day. The defendant also reported that he was enrolled in an anxiety management group but was unable to complete the group because of schedule conflicts with his job. While in IDOC, the defendant had no physical disagreements with other inmates and had only been written up for the intimidating and threatening staff incident.

¶ 35    Since the original PSI was prepared, the defendant stated that he maintained contact with his dad and a cousin. He had not seen or spoken with his mother in several years. The defendant expressed that he was sorry about the murders and thinks about them every day. He also indicated that he was trying to help others and learn from his mistakes.

¶ 36                          2. The Resentencing Hearing

¶ 37    At the defendant's resentencing, the State did not present any evidence in aggravation but presented two new victim impact statements. The defendant then proceeded with his evidence in mitigation. First, counsel requested that the sentencing court take judicial notice of the testimony of Dr. Slomowitz from the defendant's trial. The court noted that it would take judicial notice of the entire trial transcript along with the transcript of the defendant's original sentencing hearing.

¶ 38    As evidence in mitigation, the defendant testified on his own behalf and introduced several exhibits. The defendant's mitigation evidence revealed that, although he failed his

12

General Educational Development test (GED) due to low math scores, the defendant had received his high school diploma, graduating as the class valedictorian. The defendant also completed several additional classes and received several certificates including: a high school United States and Illinois constitution test, an artwork shop, a relaxation skills and violence prevention program, a class related to making better choices, a grief-related class, a cognitive behavior group, and two bible study-related programs.

¶ 39 On cross-examination, the defendant testified that he did not receive any tickets while in juvenile detention but received one in IDOC for "intimidation and threats." The defendant claimed that he received this ticket after joking with a correctional officer. After receiving this ticket, the defendant lost his job in IDOC. The defendant testified that he took whatever classes he could to learn different skills and "become better than what [he] was." He denied that he was trying to make himself look better for sentencing. On redirect examination, the defendant indicated that he had since regained his job in IDOC.

¶ 40 After the State and defense counsel made arguments regarding the defendant's sentence, the defendant made a statement in allocution in which he apologized to the victims' families and expressed remorse for his conduct. He also stated that he accepted responsibility for his actions and would accept any punishment he received.

¶ 41 After hearing the parties' arguments and the defendant's statement, the sentencing court remarked that it had read the transcript of the trial and sentencing hearing, twice; the original PSI and its updates; the appellate decision in this case; and subsequent appellate decisions. The court also stated that it had considered the victim impact statements at both the defendant's original sentencing and resentencing hearings, the cost of incarceration, as

13

well as the defendant's testimony, exhibits, and statement in allocution presented at the resentencing hearing.

¶ 42 The sentencing court then examined the statutory factors in aggravation (730 ILCS 5/5-5-3.2 (West 2018)) and found that deterrence of others and the defendant's criminal activity applied to the defendant's case. The court commented that, while the defendant did not have any prior convictions, the defendant "killed [the family] dog which, if proven beyond a reasonable doubt, would constitute a felony, and lied to police about it, which is filing a false police report." Next, the court found that no statutory factors in mitigation (730 ILCS 5/5-5-3.1 (West 2018)) applied to the defendant's case. Finally, the court evaluated the additional statutory factors in mitigation (730 ILCS 5/5-4.5-105(a) (West 2018)), which were required when sentencing a juvenile.

¶ 43 First, the sentencing court stated that it had considered the defendant's age, impetuosity, and level of maturity, including the defendant's ability to consider the risks and consequences of behavior and the presence of cognitive or developmental disability. The court found that the defendant knew "what he was doing and that was evidenced by telling the young lady on Myspace that he was going to, quote, do something bad, and shortly thereafter, something very bad happened."

¶ 44 Next, the sentencing court evaluated whether the defendant was subjected to outside pressure, including peer, familial, or negative influences. The court found that the defendant was not subjected to pressure by anyone. The court noted that the defendant may have had some negative influences in his life but "[n]ot to the degree that would *** mitigate the activities of the night in question."

14

¶ 45    The sentencing court then looked at the defendant's family, home environment, educational and social background, including any history of parental neglect, abuse, or childhood trauma. The court believed the defendant was intelligent and observed "the defendant's home life was not a good situation." The court further commented that the defendant's life at home "could have been better." The court found that the defendant's home life was "mitigating to a slight point" but added that it did not excuse, justify, or explain the defendant's offenses.

¶ 46    In discussing the defendant's potential for rehabilitation, evidence of rehabilitation, or both, the sentencing court recognized that this factor was most subject to argument from both the State and the defendant. The court found that the defendant made positive steps while in custody and noted that the defendant took classes, attended counseling, and obtained his high school diploma. The court agreed, however, with the State's position that the defendant appeared to do well in a controlled environment.

¶ 47    The next two factors required the sentencing court to consider the circumstances of the offense and the defendant's degree of participation, including the defendant's level of planning. The court remarked that the defendant consumed prescription pills, alcohol, and marijuana before entering the Mahon-Tish residence, where he executed them with their own firearms while they slept. The court also found that the evidence clearly showed the defendant was the only participant in the offense. The court stated that it believed the defendant could not have planned to enter the Mahon-Tish residence and find the weapons he used but concluded the defendant had a plan. The court explained that when the defendant spoke to Kelly Lange, the young lady he met on Myspace, "he said he was going

out to do something bad," and "[a]lthough he may not have exactly known what it was, he planned to do bad, from his own words."

¶ 48   The sentencing court then reviewed the final three juvenile sentencing factors. The court concluded that no evidence showed the defendant was unable to meaningfully participate in the defense of his case. The court then noted that it had already mentioned the defendant's prior juvenile and criminal history. Finally, the court found that the defendant expressed remorse for his crimes.

¶ 49   After discussing the factors, the sentencing court sentenced the defendant to 37.5 years for each count of first degree murder to be served consecutive to one another; 10 years for the Mike Mahon home invasion[3] to run concurrent to the murder counts; and 10 years for the Krajefska home invasion to run consecutive to all other counts, with day-for-day credit applying to this charge. The court stated that it had considered the nature and circumstances of the offense in addition to the characteristics of the defendant and determined that the sentence was necessary to protect the public from future criminal behavior of the defendant. The court acknowledged that the defendant was receiving a *de facto* life sentence but found the defendant was a "rare juvenile offender whose crime reflects an irreparable corruption and permanent incorrigibility."

¶ 50   The defendant filed a motion to reconsider his sentence, which the sentencing court denied after a hearing. This appeal followed.

---

[3]Per our previous opinion in this case, the sentencing court vacated the home invasion conviction naming Debra Tish as the victim.

¶ 51                                    II. ANALYSIS

¶ 52    On appeal, the defendant asserts that the sentencing court erred in finding that the defendant was "a rare juvenile offender whose crime reflects an irreparable corruption and permanent incorrigibility." We disagree.

¶ 53                                    A. Mistake of Fact

¶ 54    Before addressing the sentencing court's analysis of the various sentencing factors and finding or incorrigibility, we must first address whether the court made a mistake of fact when it considered the juvenile sentencing factors. The defendant alleges that the court misquoted a text message the defendant sent to Kelly Lange. The defendant argues that the court's misapprehension of fact "heavily influenced" how the court weighed the juvenile sentencing factors, specifically, the court's findings that the defendant knew "what he was doing" and had a plan. The State counters that this alleged error is forfeited, and is only reviewable for plain error, because the defendant did not raise the error during resentencing or in his motion to reconsider sentence. Sentencing errors raised for the first time on appeal are reviewable for plain error if the evidence was closely balanced or the error was sufficiently grave that it deprived the defendant of a fair sentencing hearing. *People v. Ahlers*, 402 Ill. App. 3d 726, 734 (2010).

¶ 55    When reviewing the juvenile sentencing factors at resentencing, the sentencing court referred to text messages between the defendant and Lange. Specifically, the sentencing court stated that the defendant told Lange he intended to "do something bad." The defendant asserts that he only told Lange he was "going to do something," not "something bad."

17

¶ 56 The record reveals that during the early morning hours of August 4, 2010, the defendant spoke to Lange on the phone and the two exchanged text messages. In their phone conversations, the defendant twice told Lange that he was "going to do something." Lange told the defendant "not to do something that would get him in bad trouble." In their text messages, Lange told the defendant to "stop calling and bothering" her because she was going to sleep and did not want to get in trouble. The defendant then texted, "No Im [*sic*] going to do something." Lange responded by telling the defendant not to "do [anything] bad." In a recorded interview with investigators following his arrest, the defendant recalled telling someone that he was "about to do something bad." The defendant did not think he said this to Lange, but also stated that he talked on the phone with Niola Jones, Justina's daughter, on the night of the incident.

¶ 57 In considering whether a mistaken belief influenced the sentencing court's decision, the reviewing court looks to whether the sentencing court's comments show that the court relied on the mistaken belief or used the mistaken belief as a reference point in fashioning a sentence. *People v. Cotton*, 393 Ill. App. 3d 237, 266 (2009). Remand is not required when, reviewing the record as a whole, the reviewing court is satisfied that the sentencing court's failure to correctly recall evidence did not result in a greater sentence than would have otherwise been imposed. *Cotton*, 393 Ill. App. 3d at 266.

¶ 58 Although the court may have erroneously quoted that the statement "something bad" derived from the defendant's text message to Lange, the defendant admitted to investigators that he told someone he was "about to do something bad." Thus, evidence in the record supports the inference that the defendant did tell someone he was "about to do

18

something bad." Considering the record as a whole, we are satisfied that the defendant's sentence was not the product of the sentencing court's misquotation of the defendant's text message to Lange, but rather the product of the defendant's senseless murder of two people in their sleep. We are not convinced that the misquoted text message resulted in a greater sentence than would have otherwise been imposed. See *Cotton*, 393 Ill. App. 3d at 266. Thus, there was no error, and we need go no further in our analysis under the plain-error doctrine.

¶ 59　　　　　B. Consideration of Sentencing Factors and Finding of Incorrigibility

¶ 60　The eighth amendment to the United States Constitution prohibits "cruel and unusual punishment." U.S. Const., amend. VIII. Inherent in the prohibition of cruel and unusual punishment is the concept of proportionality. *Graham v. Florida*, 560 U.S. 48, 59 (2010). Accordingly, a criminal sentence must be "graduated and proportioned to both the offender and the offense." *People v. Davis*, 2014 IL 115595, ¶ 18. When a juvenile commits a serious offense, "there is a genuine risk of disproportionate punishment." *People v. Holman*, 2017 IL 120655, ¶ 33. For sentencing purposes, juveniles are considered constitutionally different from adults. *Miller*, 567 U.S. at 471.

¶ 61　In addressing the risk of a disproportionate sentence, the United States Supreme Court has "unmistakably instructed that youth matters in sentencing." *Holman*, 2017 IL 120655, ¶ 33. The Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578 (2005)), life sentences for juveniles who commit nonhomicide offenses (*Graham*, 560 U.S. at 82), and mandatory life sentences for juveniles who commit murder (*Miller*, 567 U.S. at 489).

Our supreme court has since determined that *Miller* applies to juvenile life sentences whether natural or *de facto* (*People v. Reyes*, 2016 IL 119271, ¶ 9), or whether mandatory or discretionary (*Holman*, 2017 IL 120655, ¶ 40). In Illinois, a sentence of more than 40 years for a juvenile offender is considered a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41.

¶ 62    Although *Miller* altered the landscape for juvenile sentencing, it did not preclude the possibility that a juvenile offender receives a life sentence. A juvenile may receive a life sentence "but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Before a trial court may make this determination, the court must consider the defendant's youth and its attendant characteristics. *Holman*, 2017 IL 120655, ¶ 46. These characteristics, which are now commonly referred to as the *Miller* factors, include, but are not limited to, the following:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

20

¶ 63 Consistent with the requirement that a sentencing court must consider the defendant's youth and its attendant characteristics, the legislature enacted section 5-4.5-105 of the Unified Code of Corrections, which codified and expanded upon the *Miller* factors described in *Holman*. Before sentencing a juvenile defendant, a sentencing court must consider the following factors in mitigation:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

21

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 64 To prevail on a *Miller*-based claim, the juvenile defendant must show that the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and that the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence. *Buffer*, 2019 IL 122327, ¶ 27. "[T]he only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing." *Holman*, 2017 IL 120655, ¶ 47. Our supreme court recently instructed that we must review the proceedings to ensure that the sentencing court made an informed decision based on the totality of the circumstances that the defendant was incorrigible and that a life sentence was appropriate. *People v. Lusby*, 2020 IL 124046, ¶ 35. "No single factor is dispositive." *Lusby*, 2020 IL 124046, ¶ 35.

¶ 65 It is undisputed that the defendant received a discretionary *de facto* life sentence at his resentencing hearing. The record shows that, in fashioning the defendant's sentence, the sentencing court considered the statutory factors in aggravation (730 ILCS 5/5-5-3.2 (West 2018)) and mitigation (730 ILCS 5/5-5-3.1 (West 2018)), as well as the additional juvenile sentencing factors (730 ILCS 5/5-4.5-105(a) (West 2018)). Defendant claims that the court abused its discretion at resentencing when it (1) considered deterrence and criminal activity as factors in aggravation and (2) weighed the juvenile sentencing factors

22

and concluded the defendant was "rare juvenile offender whose crime reflects an irreparable corruption and permanent incorrigibility."

¶ 66    It is well settled that the sentencing court has broad discretion when imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). As a reviewing court, we give substantial deference to the court's sentencing decisions because the court, having observed the defendant and the proceedings, is in a superior position to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Alexander*, 239 Ill. 2d at 212-13. If a sentence falls within the appropriate statutory range, it will not be disturbed upon review, absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion occurs when a sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212.

¶ 67    A sentence should reflect both the seriousness of the offense and the objective of restoring the defendant to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Foxx*, 2018 IL App (1st) 162345, ¶ 50. This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment, and this process requires careful consideration of all aggravating and mitigating factors. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The most important consideration at sentencing is the seriousness of the offense, not the presence of mitigating factors. *Foxx*, 2018 IL App (1st) 162345, ¶ 50. We presume that the trial court considered all relevant factors and any mitigation evidence presented. *Foxx*, 2018 IL App (1st) 162345, ¶ 50. The court is not, however, obligated to recite or assign any value to each factor. *Foxx*, 2018 IL App (1st) 162345, ¶ 50. Instead,

23

the defendant is required to make an affirmative showing that the court did not consider the relevant factors. *Foxx*, 2018 IL App (1st) 162345, ¶ 50. In reviewing a sentence for an abuse of discretion, the reviewing court must not substitute its judgment for that of the trial court merely because the reviewing court would have weighed the various factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 68                        1. Consideration of Aggravating Factors

¶ 69    The defendant contends that the sentencing court improperly considered two statutory factors in aggravation of the defendant's sentence, deterrence of others and the defendant's criminal activity. Section 5-5-3.2(a) provides that deterrence and criminal activity "may be considered by the court as reasons to impose a more severe sentence." 730 ILCS 5/5-5-3.2(a) (West 2018).

¶ 70    We begin with the sentencing court's consideration of deterrence. It is true that "deterrence is diminished in juvenile sentencing" because the characteristics that render juveniles less culpable than adults—immaturity, recklessness, and impetuosity—make juveniles less likely to consider potential punishment. *People v. Morris*, 2017 IL App (1st) 141117, ¶ 33. Nevertheless, as the defendant concedes in his reply brief, a juvenile's sentence may still be found constitutional even if deterrence is considered. See *People v. Stafford*, 2018 IL App (4th) 140309-B, ¶¶ 30, 63-64 (upholding a sentence as constitutional even though the sentencing court found that the defendant's sentence was "necessary to deter others from committing the same crime"). Here, the court only briefly mentioned that the defendant's sentence was "necessary to deter others" and did not comment further on

24

deterrence. We are not convinced that the court's consideration of deterrence weighed heavily on its sentencing decision, and the record does not support such a conclusion.

¶ 71 The defendant also contends that the sentencing court improperly considered the defendant's acts of killing his dog and lying to police as prior criminal activity. Pursuant to the statute, a sentencing court may consider in aggravation whether "the defendant has a history of prior delinquency or criminal activity." 730 ILCS 5/5-5-3.2(a)(3) (West 2018). Prior criminal acts, regardless of whether they resulted in convictions, may be considered at sentencing. *People v. Jackson*, 149 Ill. 2d 540, 548 (1992). Here, the court found that, while the defendant did not have any prior convictions, the defendant killed his dog "which, if proven beyond a reasonable doubt, would constitute a felony" and lied to police "which is filing a false police report." The court noted that the section 5-5-3.2(a)(3) did not limit the court's consideration to criminal convictions.

¶ 72 According to the evidence presented at trial, the defendant broke into his uncle's home and stole a .22-caliber rifle. The defendant returned to his home, and the family dog began to annoy the defendant, so he shot the dog. Fearing he would get in trouble, the defendant dragged the dog's body to nearby railroad tracks. The defendant left the dog's body, returned home, and shot himself in the abdomen. The defendant then called 911 and reported that someone kicked in the door to the house and shot him. Police responded, and the defendant was taken to the hospital. When questioned by police at the hospital, the defendant admitted that he shot himself and that there was no intruder. The defendant was not charged with any offenses stemming from this incident but was placed at Gateway where he was diagnosed with major depressive disorder and prescribed medication.

25

¶ 73    The defendant characterizes this series of events as a suicide attempt that was a "cry for help," not criminal activity. Whether this incident constituted a suicide attempt was disputed. A social worker from Gateway testified that the defendant claimed he was not suicidal and had not planned to kill himself. The social worker also doubted that the defendant attempted suicide even though the incident was characterized as such. A clinical psychologist testifying for the State opined that the defendant shooting himself was not a suicide attempt, but an attempt to avoid getting into trouble for killing the dog. Conversely, the defendant's expert witness, a child and adolescent psychiatrist, testified that she believed the incident was a suicide attempt. Considering the evidence before the sentencing court, we cannot conclude that the court abused its discretion by finding the defendant's actions of shooting his dog and lying to police constituted criminal activity.

¶ 74    The defendant also argues that the sentencing court was required to, but did not, view the aggravating factors through the "*Miller* lens of youth." As set forth in greater detail below, however, the sentencing court not only considered the factors in aggravation but also the juvenile sentencing factors. Thus, the record shows that the court did consider the aggravating factors along with the defendant's youth and its attendant characteristics before imposing sentence. *Cf. People v. Nieto*, 2020 IL App (1st) 121604-B, ¶ 60 (the record showed that, while the sentencing court considered the defendant's young age, it did not consider the corresponding characteristics of the defendant's youth, and examination of the aggravating factors found by the court "through the lenses of *Miller*" may have led to a shorter sentence).

26

¶ 75    2. Evaluation of the Juvenile Sentencing Factors and Finding of Incorrigibility

¶ 76    The defendant challenges the court's evaluation of the first and sixth juvenile sentencing factors. The defendant suggests that, according to *Miller*, a juvenile is unable to appreciate risks and consequences or plan a crime. The defendant's assertion is incorrect. *Miller* did not preclude a sentencing court from finding that a juvenile offender appreciated risks and consequences or engaged in planning. Rather, *Miller* mandates that a sentencing court "follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, 567 U.S. at 483. The defendant had every opportunity at resentencing to offer evidence showing that he could not appreciate the risks and consequences of his conduct or engage in planning. He did not do so.

¶ 77    The defendant also argues that his text message to Lange does not indicate that he planned to commit a crime. Nevertheless, the defendant indicated he was about "to do something" and then proceeded to murder Mahon and Tish while they slept. He also went to the Krajefska's house, armed with a knife, and attacked them when they awoke to an intruder in their home. Although he may not have planned to find the weapons he used, as the sentencing court noted, that does not negate the fact that the defendant murdered two people in their sleep and attacked another couple in their home after stating he was about "to do something." The defendant's text message to Lange and the defendant's actions that followed support the sentencing court's conclusion that the defendant knew what he was doing and planned his actions.

¶ 78    The defendant also challenged the court's assessment of the second juvenile sentencing factor. The defendant contends that the sentencing court erred in finding that the defendant received no outside pressure or that negative influences in his life did not mitigate the offense. Defendant does not, however, identify any evidence presented at trial or resentencing that might suggest he was coerced, pressured, or influenced by anyone to commit the home invasions and murders for which he was convicted. While the defendant may have had negative influences in his life, such as the defendant's father, the court was well within its discretion to conclude that such negative influences did not rise to a level that would mitigate the defendant's offense conduct.

¶ 79    Next, the defendant challenges the court's evaluation of the third juvenile sentencing factor, the defendant's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma. The defendant's assertion is refuted by the record. The court noted that "the defendant's home life was not a good situation" and "certainly could have been better." The court found that, "[a]lthough perhaps mitigating to a slight point, the Court doesn't find it to excuse or justify or explain the conduct of the defendant on the night in question." Before reaching these conclusions, the trial court reviewed the defendant's original PSI and the transcript from the first sentencing hearing, both of which detailed the defendant's family and home environment. While the defendant believes his background "qualifies as much more than 'slight' mitigation," the record demonstrates that the court did not fail to adequately consider the defendant's upbringing.

¶ 80 Regarding the defendant's educational background, the defendant challenges the sentencing court's determination that the defendant was intelligent, because the defendant had a low IQ. Per fitness evaluations completed in 2009 and 2010, the defendant had an IQ of 85. Despite his IQ, other evidence presented at resentencing supports the sentencing court's conclusion that the defendant was intelligent. The original PSI indicated that the defendant was receiving A and B grades while in juvenile detention. The PSI also noted that the school believed the defendant was a "bright student." At his resentencing hearing, the defendant presented evidence that he had graduated as his class valedictorian. He also completed a United States and Illinois constitution test as well as several classes for which he received certificates. Thus, the court did not abuse its discretion in determining the defendant was intelligent.

¶ 81 After considering the statutory factors in aggravation and mitigation as well as the juvenile sentencing factors, the sentencing court also reflected on the nature of the offense, specifically that the defendant broke into the Mahon-Tish residence and shot the victims multiple times, killing them in their sleep. In imposing sentence, the sentencing court acknowledged that it was imposing a *de facto* life sentence and found that the defendant was "a rare juvenile offender whose crime reflects an irreparable corruption and permanent incorrigibility."

¶ 82 The defendant argues that the court erred in making this determination because the evidence did not show the defendant was beyond rehabilitation. Rehabilitative potential and evidence of rehabilitation, however, was only one factor for the court's consideration.

730 ILCS 5/5-4.5-105(a) (West 2018). No individual factor is dispositive. *Lusby*, 2020 IL 124046, ¶ 35.

¶ 83    At sentencing the defendant presented evidence regarding his academic progress and programs completed while incarcerated. The court stated that the defendant's potential for rehabilitation and evidence of rehabilitation was the factor most subject to argument from both the defendant and the State. The court acknowledged that the defendant had made positive steps while in custody but observed that the defendant appeared to do well in a controlled environment. The record supports the court's conclusion. For example, the "Detention Court Report," attached to the original PSI, stated the defendant "demonstrated the ability to function appropriately within the highly structured environment of the Detention Center." Furthermore, at his original sentencing hearing, his former teachers testified that the defendant had problems in school during "unstructured times" and in "unstructured areas." While in custody, however, the defendant was able to obtain good grades, graduate as valedictorian, and complete classes and programs. The defendant still had four reprimands in juvenile detention and at least one ticket in IDOC but appeared to do better overall in a controlled environment. Finally, the heinous nature of the defendant's crimes supports a finding that the defendant's crimes reflect irreparable corruption and permanent incorrigibility.

¶ 84    In sum, the record shows that the court considered all relevant evidence as well as the defendant's youth and its attendant characteristics before making an informed decision based on the totality of the circumstances. We are not at liberty to reweigh any of the

sentencing factors, as the defendant would have us do, and substitute our judgment for the that of the sentencing court. *Foxx*, 2018 IL App (1st) 162345, ¶ 52.

¶ 85                                    III. CONCLUSION

¶ 86    For the foregoing reasons, we affirm the defendant's sentence.


¶ 87    Affirmed.